UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re Application of

CHEVRON CORPORATION, et al.,                                    10 MC 00002 (LAK)

This Document Applies to ALL CASES
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# OPINION


Appearances:


Randy M. Mastro                          Bruce S. Kaplan
Scott A. Edelman                         Robert D. Kaplan
Kristen Hendricks                        Ellen London
Andrew E. Neuman                         FRIEDMAN KAPLAN SEILER & ADELMAN LLP
William E. Thomson                       *Attorneys for Movant Steven R. Donziger*
GIBSON DUNN & CRUTCHER LLP
*Attorneys for Chevron Corporation*      Ilann M. Maazel
                                         Jonathan S. Abady
Paul E. Dans                             Adam Pulver
Jorge A. Mestre                          O. Andrew F. Wilson
Andrés Rivero                            EMERY CELLI BRINCKERHOFF & ABADY LLP
RIVERO MESTRE & CASTRO                   *Attorneys for Lago Agrio Plaintiffs*
*Attorneys for Rodrigo Pérez Pallares*

Alan Vinegrad
Jason P. Criss
John Han
COVINGTON & BURLING LLP
*Attorneys for Ricardo Reis Veiga*

# Table of Contents

Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    I.     The Present Posture of the Ecuadorian Proceedings and the Urgency of this
           Matter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    II.    *Crude*, Donziger's Central Role in the Events at Issue, and these Subpoenas. . . . 5
    III.   The U.S. Litigation Against Texaco and Chevron. . . . . . . . . . . . . . . . . . . . . . . . . 9
         A.   Texaco's Operations in Ecuador. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
         B.   The Aguinda Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    IV.   The Settlement and Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    V.    The Ecuadorian Litigation and Criminal Prosecutions. . . . . . . . . . . . . . . . . . . . 12
         A.   The Lago Agrio Litigation, the Global Assessment and Other Evidence of
              Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
         B.   The Initial Criminal Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
         C.   Donziger Solicits the Making of *Crude*. . . . . . . . . . . . . . . . . . . . . . . . . 20
         D.   President Correa Takes Office. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    VI.   The UNCITRAL Arbitration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    VII.  The Nature of Donziger's Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         A.   The March 30, 2006 Intimidation of the Judge. . . . . . . . . . . . . . . . . . . 28
         B.   The Plan to Pressure the Court With an "Army". . . . . . . . . . . . . . . . . . 29
         C.   Killing the Judge?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    I.     Judicial Code Section 1782. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
         A.   Statutory Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
         B.   Discretionary Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    II.    Deposition of Adverse Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
         A.   The Need to Depose Donziger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
         B.   Donziger's Role. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
         C.   Extent of Discovery Already Conducted. . . . . . . . . . . . . . . . . . . . . . . . 40
         D.   Risk of Encountering Privilege and Work-Product Issues. . . . . . . . . . . . 40
             1.   Basic Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
             2.   The Normal Means of Claiming Privilege. . . . . . . . . . . . . . . . 44
             3.   Application to Donziger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    III.   The Proposed Modification of the Subpoenas. . . . . . . . . . . . . . . . . . . . . . . . . . 50

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

LEWIS A. KAPLAN, *District Judge*.

Chevron is the target of litigation brought in Ecuador by the so-called Lago Agrio plaintiffs[1] in which the latter seek to recover $113 billion[2] for alleged environmental pollution by Texaco, Inc. ("Texaco"), from Texaco's current owner, Chevron Corporation ("Chevron").[3] Rodrigo Pérez Pallares and Ricardo Reis Veiga (the "Individual Petitioners") are facing criminal charges there as a result of having signed a settlement of such claims on behalf of Texaco some years ago. The criminal charges at least in part are a result of an alliance between the Lago Agrio plaintiffs and the Ecuadorian government, which has both financial and political interests in the success of the lawsuit. Chevron and the Individual Petitioners are seeking to defend themselves by obtaining discovery in the United States under Section 1782 of the Judicial Code,[4] which they believe will demonstrate that both the civil litigation and the criminal prosecution in Ecuador have been tainted by fraud and other misconduct by the Lago Agrio plaintiffs and improper collusion among them and the government of Ecuador ("GOE").

At the heart of this matter is Steven R. Donziger, a member of the New York Bar but, much more importantly, the field general of the Lago Agrio plaintiffs' efforts in Ecuador – efforts that include lobbying, media and public relations, fund raising, and other activities. Chevron and

---

[1]    The Lago Agrio plaintiffs are forty-eight individuals.

[2]    In September 2010, the Lago Agrio plaintiffs raised their damages assessment, in a submission to the Lago Agrio court, to $113 billion at the high end of the range, which is significantly greater than the $27 billion figure in the report published by the supposedly independent court-appointed expert.

[3]    Chevron acquired Texaco in 2001, after Texaco discontinued operations in Ecuador and settled environmental claims with its government.

[4]    28 U.S.C. § 1782.

the Individual Petitioners here subpoenaed Donziger to produce documents and to give testimony, as they maintain that Donziger is the prime actor, or among the prime actors, in the alleged fraud and misconduct. Donziger moved to quash the subpoenas. Most significantly, he argued in substance that his status as an attorney involved adversely to Chevron and the Individual Petitioners in the Ecuadorian litigation protects him from (1) being compelled to assert his claims of attorney-client privilege and work product protection on a document-by-document, communication-by-communication basis and thus depriving Chevron and the Individual Petitioners of a meaningful opportunity to challenge those claims and (2) giving evidence even as to obviously non-privileged matters.

It is common ground that one party to a litigation should not easily be permitted to take discovery of the lawyers on the other side. The possibilities for mischief and abuse are too great. In the quite unusual circumstances of this case, however, the need for the discovery, the plainly unprivileged nature of many of Donziger's activities, the evidence of possible fraud and misconduct by Donziger, and other considerations are sufficiently great to require that Donziger respond on the merits to the subpoenas. He must give discovery as to non-privileged matters. He must not be exempted from making specific claims of privilege or from defending those claims against any challenges. Accordingly, the Court denied the motions to quash and required compliance, saving to Donziger the ability to make specific claims of privilege for later adjudication by the Court. It did so in a summary order[5] with the promise of a fuller opinion to follow. This is that fuller opinion.

---

[5]  *In re Application of Chevron Corp.,* No. 10 MC 00002 (LAK), 2010 WL 4118093 (S.D.N.Y. Oct. 20, 2010).

*Facts*

I.    *The Present Posture of the Ecuadorian Proceedings and the Urgency of this Matter*

It is important to begin with a brief statement of the present posture of matters in Ecuador, which has two especially significant aspects.

First, the Ecuadorian court in which the civil case is pending appointed a supposedly neutral, independent Ecuadorian expert, Richard Stalin Cabrera Vega, to render a "global assessment" of the claim. Cabrera has recommended a multi-billion dollar award against Chevron. As will appear, however, there is substantial evidence that (1) Cabrera was appointed as a result of Lago Agrio plaintiffs' *ex parte* contacts with and pressure on the Ecuadorian courts, (2) at least part of his report was written by consultants retained by the Lago Agrio plaintiffs, and (3) the report was passed off as Cabrera's independent work. In short, there is evidence to support Chevron's claim that the "global assessment" is a fraud orchestrated by the Lago Agrio plaintiffs. There is evidence too that other expert evidence submitted to the Ecuadorian courts on behalf of those plaintiffs also was fraudulent. Chevron thus stands in jeopardy of a huge judgment that, if ultimately rendered, could be the result of a fraud practiced by the Lago Agrio plaintiffs.

Second, the Lago Agrio plaintiffs are attempting to procure the criminal prosecution of the Individual Petitioners. The reason they do so relates to the fact Texaco long ago entered into a settlement with the GOE, signed on its behalf by the Individual Petitioners, which may well have released the claims upon which the Lago Agrio plaintiffs sue. A criminal prosecution of the Individual Petitioners, especially a successful one, would overcome or at least help to overcome that obstacle – especially in a country in which, at least according to Donziger: "You can solve anything with politics as long as the judges are intelligent enough  to understand the politics . . . .  [T]hey

don't have to be intelligent enough to understand the law, just as long as they understand the politics."[6]

Until recently, the Lago Agrio plaintiffs' efforts to instigate criminal charges against the Individual Petitioners were unsuccessful, as Ecuadorian prosecutors had rejected their claims. But the political climate in Ecuador has changed, and these plaintiffs have obtained the support of the Ecuadorian president. The president, after at least one meeting with plaintiffs' representatives, called for the prosecution of these and other individuals involved in the settlement. Cabrera's "global assessment" then was submitted to the prosecutor who, soon thereafter, reopened criminal proceedings against the Individual Petitioners, citing new evidence. A preliminary hearing – which will determine whether the Individual Petitioners must stand trial – is scheduled for November 10, 2010. The Individual Petitioners therefore have an urgent need quickly to obtain evidence of the allegedly fraudulent nature of the global assessment and of any misconduct by the Lago Agrio plaintiffs and the GOE with respect to the criminal prosecution.

As the foregoing demonstrates, the parties are engaged in a race – the Lago Agrio plaintiffs to bring the Ecuadorian proceedings to a close and Chevron and the Individual Petitioners to obtain evidence that they hope will demonstrate that the proceedings against them have been tainted. The Lago Agrio plaintiffs have refused to stay or cooperate in efforts to stay the Ecuadorian proceedings pending resolution of this and other efforts by Chevron and the Individual Petitioners to obtain proof of their allegations through the collection of evidence in the United States. They thus have forced this and other courts to choose between conducting expedited proceedings or depriving Chevron and the Individual Petitioners of meaningful opportunities to obtain relief here.

---

[6] Hendricks Decl. II Ex. A, CRS-129-00-02.

II.      *Crude, Donziger's Central Role in the Events at Issue, and these Subpoenas*

Chevron and the Individual Petitioners have responded to their plight in Ecuador by bringing a series of actions in the United States under Section 1782 of the Judicial Code[7] to obtain discovery in aid of the Lago Agrio litigation and of a related international arbitration in which Chevron claims, among other things, that it is being denied due process in Ecuador.  Many U.S. courts have granted such discovery,[8] which has focused in part on the effort to demonstrate that the global assessment and evidence submitted in Ecuador have been fraudulent, at least in significant respects.

Donziger is at the center of this controversy.  While he is a member of the New York Bar and years ago worked on a predecessor to the Lago Agrio lawsuit that was brought in this Court, he is not qualified to practice law in Ecuador.  He does not serve as litigation counsel there.  He nevertheless has been extremely active in support of the Lago Agrio plaintiffs.

The evidence before this Court shows that Donziger has attempted to (1) intimidate the Ecuadorian judges, (2) obtain political support for the Ecuadorian lawsuit, (3) persuade the GOE to promote the interests of the Lago Agrio plaintiffs, (4) obtain favorable media coverage, (5) solicit

---

[7]

28 U.S.C. § 1782.

[8]

*In re Application of Chevron Corp.*, No. 1:10-mi-00076 (N.D. Ga. Mar. 2, 2010) (Calmbacher); *Chevron v. Stratus Consulting, Inc.*, No. 10-cv-00047 (D. Colo. Mar. 4, 2010); *In re Application of Chevron Corp.*, No. 4:10-mc-134 (S.D. Tex. Apr. 5, 2010) appeal docketed, No. 10-20389 (5th Cir. June 11, 2010) (3TM); *In re Application of Chevron Corp.*, No. 2:10-cv-02675 (D.N.J. June 15, 2010), appeal docketed, No.10-2815 (3d Cir. June 18, 2010) (UBR); *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (WMc) (S.D. Cal. June 23, 2010) (E-Tech); *In re Application of Chevron Corp.*, No. 1:10-mc-00371 (D.D.C. July 22, 2010) (Wray); *In re Application of Chevron Corp.*, No. 3:10-cv-00686 (M.D. Tenn. Aug. 17, 2010), appeal docketed, No.10-6035 (6th Cir. Aug. 25, 2010) (Quarles); *Chevron Corp. v. Champ*, No. 1:10-mc-0027-GCM-DLH (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp.*, No. 10-MC-21JH/LFG (D.N.M. Sept. 1, 2010) (Kamp).

6

the support of celebrities (including Daryl Hannah and Trudie Styler) and environmental groups, (6) procure and package "expert" testimony for use in Ecuador, (7) pressure Chevron to pay a large settlement, and (8) obtain a book deal.  Among his efforts was his persuasion of Joseph Berlinger, a documentary film maker, to make a documentary about the Lago Agrio litigation from the plaintiffs' point of view.  That film, entitled *Crude,* purports to tell the story of the Lago Agrio litigation.  It is no exaggeration to say that Donziger is the star of the film, much of which focuses on his words and activities.

*Crude* contains a good deal of material that casts Donziger and his cause in a negative light, although that doubtless was not the aura in which he expected to appear when he acted and spoke before Mr. Berlinger's cameras.  *Crude* itself contains evidence that (1) Donziger participated in a supposedly neutral focus group conducted by one Carlos Beristain, who provided a report used by Cabrera to support the damages assessment, thus calling into question the impartiality of the global assessment,[9] (2) Donziger engaged in "what he called 'pressure tactics' to influence a judge to prevent the judicial inspection of a laboratory allegedly being used by the Lago Agrio plaintiffs to test for environmental contamination . . . [and] declare[d] that '[t]his is something you would never do in the United States, but Ecuador, you know, this is how the game is played, it's dirty,'"[10] (3) "suggest[s] the possibility of misconduct on the part of both [Donziger] and GOE" in connection with the prosecution of the Individual Petitioners,[11] and (4) an associate of Donziger's

---

[9]

   *In re Application of Chevron Corp.,* 709 F. Supp. 2d 283, 296 (S.D.N.Y. 2010) (hereinafter *Chevron I*).

[10]

   *Id.*

[11]

   *Id.* at 298.

"coordinat[ed] everything" with the president of Ecuador.[12]  But the content of the publicly released documentary film has proved to be only the tip of the iceberg.

*Crude* prompted Chevron and the Individual Petitioners to seek production of Mr. Berlinger's outtakes – the footage he shot that did not appear in the film.  That effort was largely successful,[13] and more than 85 percent of all of the outtakes now have been produced.

The outtakes are even more disturbing.  They contain statements by Donziger that the Ecuadorian court system is corrupt, that the Lago Agrio plaintiffs can prevail only by pressuring and intimidating the courts, and that the facts have to be twisted to support the plaintiffs' theories.  Donziger's own words raise substantial questions as to his possible criminal liability and amenability to professional discipline.  Among his other statements in the outtakes are these:

> "They're all [i.e., the Ecuadorian judges] corrupt!  It's – it's their birthright to be corrupt."[14]

> "The only language that I believe this judge is going to understand is one of pressure, intimidation and humiliation.  And that's what we're doing today.  We're going to let him know what time it is. . . .  As a lawyer, I never do this.  You don't have to do this in the United States.  It's dirty. . . . It's necessary.  I'm not letting them get away with this stuff."[15]

> "The judicial system is so utterly weak. The only way that you can secure a fair trial is if you do things like that.  Like go in and confront the judge with media around and fight and yell and scream and make a scene.  That would never happen in the

---

12

    *Id.* at 289, 296.

13

    *See id.*

14

    Hendricks Decl. II Ex. A, CRS-053-02-03.

15

    *Id.,* CRS-052-00-06.

United States or in any judicial system that had integrity."[16]

"Science has to serve the law practice; the law practice doesn't serve science."[17]

"At the end of the day, this is all for the Court, just a bunch of smoke and mirrors and bullshit."[18]

"I once worked for a lawyer who said something that I have never forgotten. Facts do not exist. Facts are created. Ever since that day, I realized how the law works."[19]

Nor do the outtakes stand alone. There is evidence obtained in other Section 1782 actions brought by Chevron that Donziger and others associated with him have presented false evidence and engaged in other misconduct in Ecuador. Indeed, the overall record has resulted in findings by three other district courts, in Chevron's Section 1782 proceedings against other respondents involved in the plaintiffs' efforts in the Lago Agrio case, that any claims of attorney-client privilege were overcome by the crime-fraud exception.[20]

---

[16]  *Id.*, CRS-053-02-01.

[17]  *Id.*, CRS-158-02-09.

[18]  *Id.*, CRS-195-05-01.

[19]  *Id.,* CRS-198-00-06.

[20]  *In re Chevron Corp.*, No. 10-MC-21 (J/LFG) [DI 11] (D.N.M. Sept. 13, 2010) (finding "that . . . discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants."); *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (WMc) [DI 9] (S.D. Cal. Sept. 10, 2010) (crime-fraud exception applies because "[t]here is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."); *Chevron Corp. v. Champ*, No. 1:10-mc-0027 (GCM-DLH) [DI 12] (W.D.N.C. Aug. 30, 2010) ("While this court is unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be considered fraud by any

Following production of the outtakes, Chevron and the Individual Petitioners obtained the subpoenas at issue here.  In brief summary, these subpoenas seek documents and deposition testimony from Donziger regarding his interactions and communications with (1) the supposedly neutral, independent Ecuadorian court-appointed expert who rendered the so-called "global assessment" of the case, (2) the Lago Agrio plaintiffs' experts, (3) the Ecuadorian courts, (4) the GOE, and (5) others affiliated with the plaintiffs.  The matter then came before the Court on motions by Donziger and the Lago Agrio plaintiffs to quash the subpoenas.

With this overall view of where matters stand in Ecuador and how the present controversy developed, the Court turns to a more detailed consideration of the pertinent facts.

III.    *The U.S. Litigation Against Texaco and Chevron*

This dispute arises in the context of nearly two decades of litigation concerning oil exploration and extraction in Ecuador by Texaco, which became a wholly-owned subsidiary of Chevron in 2001.[21]

A.    *Texaco's Operations in Ecuador*

In 1964, Texaco Petroleum Company ("TexPet"), a subsidiary of Texaco, began oil exploration and drilling in the Oriente region of eastern Ecuador. In the following year, TexPet

---

court. If such conduct does not amount to fraud in a particular country, then that country has larger problems than an oil spill.").

[21]    The background of this matter is further described in other decisions of this Court and the Second Circuit. *See generally Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998); *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334 (S.D.N.Y. 2005); *Aguinda v. Texaco*, 945 F. Supp. 625 (S.D.N.Y. 1996); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001).

started operating a petroleum concession for a consortium owned in equal shares by TexPet and Gulf Oil Corporation (the "Consortium"). The GOE thereafter acquired Gulf's interest through its state-owned oil company, Petroecuador, and the GOE became the majority stakeholder in the Consortium in 1976. TexPet operated a trans-Ecuadorian oil pipeline and the Consortium's drilling activities until 1990, when Petroecuador assumed those functions. Two years later, TexPet relinquished all of its interests in the Consortium, leaving it owned entirely by Petroecuador.[22] While not especially important to the matter immediately at issue here, it is interesting that whatever pollution may have occurred in the past eighteen years thus seems to have been the responsibility of the GOE, not Chevron or Texaco.

     B.     *The Aguinda Action*

       In 1993, a group of residents of the Oriente region brought a class action in this Court against Texaco arising from TexPet's role in the Consortium. The complaint, captioned *Aguinda v. Texaco*, alleged that "between 1964 and 1992 Texaco's oil operation activities polluted the rain forests and rivers in Ecuador." The plaintiffs sought billions of dollars on a variety of theories, including negligence, strict liability, and equity, to "redress contamination of the water supplies and environment."[23] Donziger, then two years out of law school, was one of the lawyers who represented the plaintiffs.

       Texaco sought dismissal of the *Aguinda* action on the ground of *forum non conveniens*. It argued, among other things, that Ecuador was an adequate and appropriate alternative

---

[22]

     *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

[23]

     *See Republic of Ecuador*, 376 F. Supp. 2d at 341.

forum.  This Court ultimately dismissed the case on *forum non conveniens* grounds in 2001,[24] and the Second Circuit affirmed.[25]

IV.    *The Settlement and Release*

While the *Aguinda* litigation was pending in New York, TexPet in 1995 entered into a settlement agreement with the GOE and Petroecuador (the "Settlement") whereby TexPet agreed to perform specified remedial environmental work in exchange for a release of claims by the GOE. The release, which covered TexPet, Texaco, and related companies, encompassed "all the Government's and Petroecuador's claims against the Releases for Environmental Impact arising from the Operations of the Consortium, except for those related to the obligations contracted" under the Settlement, which were to be "released as the Environmental Remedial Work is performed to the satisfaction of the Government and Petroecuador."[26]

Three years later, the GOE entered into an agreement with TexPet (the "Final Release") according to which the GOE agreed that the Settlement had been "fully performed and concluded" and "proceede[ed] to release, absolve, and discharge" TexPet and related companies "from any liability and claims . . . for items related to the obligations assumed by TexPet" in the Settlement.[27]

---

[24]

    *See Aguinda*, 142 F. Supp. 2d 534.

[25]

    *See Aguinda*, 303 F.3d 470.

[26]

    *Republic of Ecuador*, 376 F. Supp. 2d at 341-42.

[27]

    *Id*. at 342.

V.      *The Ecuadorian Litigation and Criminal Prosecutions*

A.      *The Lago Agrio Litigation, the Global Assessment and Other Evidence of Misconduct*

In 2003, following the dismissal of the *Aguinda* action by this Court, a group of Ecuadorians, including a number of the *Aguinda* plaintiffs, sued Chevron in Lago Agrio, Ecuador (the "Lago Agrio litigation").  The Lago Agrio plaintiffs assert, among other things, claims for damages for deterioration of their health and the environment.  They do so under an Ecuadorian statute – enacted in 1999, and thus after the Final Release – that purports to permit such actions by persons "directly affected."[28]  The defendants contend that the statute impermissibly purports to allow plaintiffs to assert, as private attorneys-general, claims that belonged to the GOE but that were released pursuant to the Settlement and Final Release.[29]  Interestingly, the GOE later announced that it would receive ninety percent of any recovery for remediation purposes.[30]

It is unnecessary for present purposes to trace all of the twists and turns of the Lago Agrio litigation.  It is, however, important to focus on the fact that the Lago Agrio court, to complete the "final evidentiary phase" of the litigation, ordered the "global assessment" referred to above.  On March 19, 2007, it appointed Cabrera to serve as an independent expert.  Cabrera was officially sworn on June 13, 2007, promising to "perform his duties faithfully and in accordance with science,

---

[28]
Hendricks Decl. I Ex. BB, ¶ 28.

[29]
*Republic of Ecuador*, 376 F. Supp. 2d at 342.

[30]
Dans Decl. Ex. 21, at 2.

13

technology, and the law, with complete impartiality and independence vis-à-vis the parties."[31]  On

March 28, 2008, Cabrera set the amount of damages at $16 billion and filed his report several days

later.  Cabrera amended his report on November 17, 2008, raising the damages figure to $27 billion.

 But that is not even remotely the whole story.

For one thing, the outtakes reveal Pablo Fajardo, one of the Lago Agrio plaintiffs'

Ecuadorian lawyers,[32] describing several apparently *ex parte* meetings he had with an Ecuadorian

judge – before Cabrera was appointed – regarding the global assessment and the appointment of a

neutral and impartial expert to conduct it.  In the course of doing so, he stated that he had a pretty

good idea of who would be appointed.[33]  This appears to have been an understatement.

Donziger boasted in the *Crude* outtakes that Cabrera "never would have [been

appointed] had we not really pushed him."[34]  And the outtakes confirm that the Lago Agrio plaintiffs

indeed did know in advance that Cabrera would be the appointee.  On March 3, 2007, more than two

weeks before the appointment, they held an all-day meeting – attended by Cabrera, Donziger,

plaintiffs' Ecuadorian counsel, and partisan experts retained by the plaintiffs – to plan the report that

Cabrera would issue.  During that meeting, Fajardo informed the group that the goal of the meeting

was to "define the overall structure of [the] comprehensive expert examination."[35]  Donziger later

---

[31]  Request for Judicial Notice [DI 15] Ex. B - Part 1, at 4.

[32]  As *Crude* and the outtakes make clear, Fajardo and Donziger are close associates.

[33]  Hendricks Decl. II Ex. A, CRS-158-02-06.

[34]  *Id.*, CRS-361-11-01.

[35]  *Id.*, CRS-187-01-02-02.

clarified that the plaintiffs' work plan would involve not only evidence and remediation, but also writing the expert's opinion.[36]

The *Crude* outtakes reveal that Fajardo presented a PowerPoint presentation during the morning session that outlined the *Plan Para Examen Pericial Global,* or Plan for the Global Expert Assessment.[37]  He emphasized that everyone would contribute to the report, explaining: "And here is where we do want the support of our [i.e., the Lago Agrio plaintiffs'] entire technical team . . . of experts, scientists, attorneys, political scientists, so that all will contribute to that report – in other words – you see . . . *the work isn't going to be the expert's.  All of us bear the burden.*"[38]  Someone asked whether the final report would be prepared only by the expert.  Fajardo responded that the expert would "sign the report and review it. But all of us . . . have to contribute to that

---

[36]

     *Id.*, CRS-189-00-02.

[37]

     *Id.*, CRS-187-01-02.

[38]

     *Id.*, CRS-191-00-03 (emphasis added).

     Chevron and the Lago Agrio plaintiffs disagree about a portion of the translation of this clip. The disagreement, however, is immaterial for two reasons.  First, the Lago Agrio plaintiffs do not dispute that Fajardo said "the work isn't going to be the expert's."  They instead quibble over a subsequent statement.  Second, all agree that one of the plaintiffs' American experts, through a translator, asked Fajardo in substance whether "the final report [is] going to be prepared only by the expert?" (In the alternate translation, the question is "will the final report be prepared by the expert alone?").  The Lago Agrio plaintiffs contend that Fajardo responded, "What the expert will do is give his criteria . . . right . . . his opinion, and sign the report, and review it as well.  But we, all of us, have to contribute to the report.  Together, right."  Chevron's translation attributes the following statement to Fajardo: "What the expert is going to do is [unintelligible] and sign the report and review it.  But all of us [unintelligible] have to contribute to that report."  The substance of both translations therefore is the same.  It is not disputed that the Lago Agrio plaintiffs planned to make a significant contribution to the Cabrera's report, quarreling only as to whether Cabrera would have some limited involvement.  And if there were any remaining doubt about the Lago Agrio plaintiffs' intent, the lunch meeting the following day, which was conducted in English, offers clarity.

report."[39]  Plaintiffs' consultant Ann Maest said, "Together?," which Fajardo confirmed.  Maest then

stated, "But not Chevron," a comment met with widespread laughter.[40]

In the afternoon session, the group discussed the "work plan," the first document that

Cabrera would be required to sign and file with the Ecuadorian court.[41]  Donziger proposed that he

and the U.S.-based consultants form a "work committee" to present a "draft plan" in a few days.[42]

Looking at Cabrera, Donziger then said, "and Richard, of course you really have to be comfortable

with all that. And we'll also define the support the expert needs."[43]  The recording of the meeting

ended with Donziger commenting, "We could jack this thing up to $30 billion in one day."[44]

Outtakes recorded on the following day reveal that Donziger made clear to one of

plaintiffs' U.S. environmental consultants that everything the plaintiffs were doing was to be

concealed from Chevron, his "goal [being] that they don't know shit."[45]  During the same lunch, the

consultants told Donziger that there was no evidence that contamination from the pits had spread

---

[39]

    *Id.*

[40]

    *Id.*

[41]

    *Id.*, CRS-189-00-02.

[42]

    *Id.*

[43]

    *Id.*

    It is interesting, and possibly significant, that Donziger and Cabrera, soon to be appointed the neutral and impartial expert, already were on a first-name basis.

[44]

    Hendricks Decl. I Ex. A, CRS-193-00-01.

[45]

    Hendricks Decl. II Ex. A, CRS-196-00-01.

into the surrounding groundwater. Donziger responded, saying "You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want," and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our . . . theory," then "[w]e can do it. And we can get money for it."[46] He went on saying, "[T]his is all for the Court just a bunch of smoke and mirrors and bullshit."[47] When one consultant argued that "there is not enough information on that groundwater" and that "the one hole in the remediation, is the water," Donziger broke off the discussion, stating, "There's another point I got to make to these guys, but I can't get this on camera," and the footage ended.[48] Nor was that the only occasion during lunch in which Donziger asked to go off the record. When one expert commented that it had been "bizarre" to have Cabrera present at the meeting the day before, Donziger instructed the expert not to talk about that fact and told the camera operator that those comments were off the record.[49] The expert elaborated that he was surprised that there had been a meeting during which "everything" had been laid out while the expert was present.[50]

Thus, the *Crude* outtakes give substantial reason to believe that Cabrera, the supposedly neutral expert, worked in collusion with the plaintiffs and that his report was written,

---

[46]
    *Id.*, CRS-195-05-01.

[47]
    *Id.*

[48]
    *Id.*

[49]
    *Id.*, CRS-196-00-01.

[50]
    *Id.*

at least in major part, by plaintiffs and their consultants.[51]  And that suspicion is supported by other evidence.[52]  Another example relates to Dr. Charles William Calmbacher, one of the plaintiffs' experts.  Earlier in the litigation, the court directed that the plaintiffs and Chevron jointly investigate and report on conditions at a number of former Consortium production sites.[53]  The plaintiffs selected Calmbacher to act as their expert in charge of the inspections and to report with respect to some of the sites.[54]  In early 2005, reports were filed in his name for two of those sites, each purporting to show extensive environmental damage.[55]  In March 2010, however, Dr. Calmbacher testified in a Section 1782 deposition as follows:

> "Q . . . To the extent that someone took this signature page that is currently attached at the last page of Exhibit 12 and attached it to this report and represented to the Court in Lago Agrio that you had written this report and reached these conclusions, that would be false, correct?  A. That's correct. I did not reach these conclusions and

---

[51]

    Chevron challenged Cabrera's appointment in Ecuador.  The Lago Agrio plaintiffs responded that he was impartial.  Neuman Decl. Ex. C, at 2.

[52]

    Prior to the submission of the first Cabrera report in March 2008, plaintiffs' consulting experts sent English language emails regarding proposed language for a summary report and other annexes to a translation service.  Neuman Decl. Ex. U, at 141.  Another email exchange reflected correspondence about an "attached proposed global damages assessment" and an "[attached] draft Summary Report."  *Id.* at 136, 546.  Finally, a linguistic analysis of the Cabrera report found that certain sections were written by a native English speaker and translated to Spanish, while a native Spanish speaker wrote other sections of the report.  Hendricks Decl. II Ex. S, at 6.  There is no evidence that Cabrera, an Ecuadorian, is a native English speaker.

[53]

    Hendricks Decl. I Ex. EE, ¶ 44.

[54]

    *In re Application of Chevron Corp.,* No. 1:10-MI-0076-TWT-GGB, Order, at 2 (N.D. Ga. dated Mar. 2, 2010).

[55]

    *Id.* at 3.

I did not write this report."[56]

"Q. So the conclusions in the expert report for Shushufindi 48, Exhibit 13, to the extent they're presented to the Court as conclusions you reached, that presentation would be false, correct? A. Correct."[57]

"Q. Did you ever find that any of the sites that you inspected required any further remediation? A. No."[58]

"Q. While you were working as a judicial inspection expert for the plaintiffs, did you ever conclude that TexPet had failed to adequately remediate one of the sites?  A. I didn't no."[59]

Dr. Calmbacher made clear also that he had "discussed what [his] findings were on this site and others" with Donziger and believes that Donziger would have known that the reports submitted over Calmbacher's name were not authorized by Calmbacher.[60]  He testified as well that Donziger told him that "he wanted the answer to be that there was contamination and people were injured . . . [b]ecause it makes money.  That's what wins his case."[61]

There is still more disturbing evidence.  Prior to the start of the global inspection, the Lago Agrio plaintiffs performed analyses of purported judicial inspection samples that bore the name "Selva Viva Laboratory" on the chain of custody forms.  According to Dr. Calmbacher, however, there is no Selva Viva Laboratory in Ecuador – it in fact was the plaintiffs' team's hotel

---

[56]      Hendricks Decl. I Ex. DD, at 116:9-10.

[57]      *Id.* at 117:16-20.

[58]      *Id.* at 113:23-25.

[59]      *Id.* at 115:15-19.

[60]      *Id.* at 118:15-119:1.

[61]      *Id.* at 92:2-11.

room, where they apparently did some rudimentary tests.[62]  Indeed, Selva Viva is an entity organized

in Ecuador in 2004; Donziger is the president.[63]

### B.    The Initial Criminal Investigation

In 2003, the same year in which the Lago Agrio litigation was filed, the GOE filed

a criminal complaint against the Individual Petitioners and former GOE and Petroecuador officials,

alleging that they had falsified public documents in connection with the Settlement and Final

Release and had violated Ecuador's environmental laws.

In 2004, the Ecuadorian Prosecutor General began an investigation of the criminal

charges.  The Ecuadorian Deputy Attorney General explained in an email to plaintiffs' counsel in

the Lago Agrio litigation that the criminal prosecutions were potentially a "way to nullify or

---

[62]

*Id.* at 132:11-133:19, 107:15-108:2.

[63]

Hendricks Decl. I Ex. BB.

In other disturbing incidents, Donziger appears to have used a remediation cost estimate that he knew to have been overstated.

One of plaintiffs' consulting experts, David Russell, in 2003 estimated that the cost of the environmental clean-up would be $6 billion.  In late January 2006, Amazon Watch, a non-governmental organization closely allied with Donziger and the Lago Agrio plaintiffs, cited that estimate in a letter to the U.S. Securities and Exchange Commission that accused Chevron of securities law violations in relation to its disclosures about the Lago Agrio litigation.  On February 14, 2006, Russell directed Donziger to stop using that estimate because it was "too high by a substantial margin, perhaps by a factor of ten, or more" and said that he would so testify if subpoenaed.  Hendricks Decl. II Ex. TT.  Donziger, however, continued to use the $6 billion cost estimate.  *See id.* Ex. A, CRS-023-07-04, CRS-116-01-01, CRS-38-02-02.

Another incident occurred later in 2006.  A different expert estimated the clean-up cost at $3 billion.  *Id.* Ex. VV.  Donziger then wrote to him as follows: "GUARD THAT NUMBER WITH YOUR LIFE PLEASE. DO NOT TELL ANYBODY.  THIS HAS A WAY OF GETTING BACK TO TEXACO."  *Id.* (emphasis in original).

undermine the value of the" Settlement and Final Release, though "evidence of criminal liability established by the Comptroller [General's] Office was rejected by the prosecutor."[64]  Two years later, however, the District Prosecutor found that "there [was] not sufficient evidence to pursue the case against . . . Mr. Ricardo Reis Veiga and Mr. Rodrigo Pérez Pallares, representatives of TEXPET."[65]  As we shall see, the same District Prosecutor in his subsequent capacity as national Prosecutor General later decided to reopen the criminal investigation and charge the Individual Petitioners based on the same allegations that he had previously dismissed for lack of evidence.

C.    *Donziger Solicits the Making of* Crude

In 2005, Donziger solicited Joseph Berlinger to make a documentary film depicting the litigation from the perspective of the Lago Agrio plaintiffs.  Berlinger agreed.  For three years, he and his staff shadowed Donziger and other plaintiffs' lawyers and representatives, capturing six hundred hours of raw footage of the people and events surrounding the litigation.  In 2009, Berlinger released *Crude*.

D.    *President Correa Takes Office*

In 2006, while the Lago Agrio litigation was still pending, Rafael Vincente Correa Delgato was elected president of Ecuador on a platform of economic and social reform.  President Correa, who describes himself as a "humanist," a "Christian of the left," and a proponent of

---

[64]    Dans Decl. Ex. 3, at 1-2.

[65]    *Id*. Ex. 11, at 10.

twenty-first century socialism,[66] condemned Ecuador's oil contracts as "true entrapment for the country."[67]   The election appears to have marked a turning point for the prospects of a criminal prosecution of the Individual Petitioners.

*Crude* outtakes include a brief interview with Donziger on his way to President Correa's January 2007 inauguration.  Donziger boasted that President Correa's inauguration was a potentially "critical event" for the outcome of the Lago Agrio litigation.  Soon thereafter, Donziger explained that the Lago Agrio plaintiffs and the GOE had "been really helping each other."[68]  The outtakes depict Donziger discussing the importance of working his contacts in the new government.[69]  And work them he did.

On January 31, 2007, Donziger met with Joseph C. Kohn of Kohn Swift & Graf, P.C., a U.S. law firm providing financial support for the Lago Agrio litigation.  The outtakes depict Donziger explaining that the plaintiffs had been working with the Prosecutor General's office and that, although the criminal proceedings were closed, there is "no finality" in Ecuador.[70] Approximately a week later in a radio segment, plaintiffs asked President Correa to bring criminal

---

[66]   *'Socialismo' en el discurso de Correa*, EL UNIVERSO, July 23, 2007, http://www.eluniverso.com/2007/07/23/0001/8/52BB6011269D4A87B7E96771F48D4A62.html (last visited Oct. 8, 2010); *see also  Rafael Correa Biography*, GUERRILLERO, June 29, 2009, http://www.guerrillero.cu/english/index.php?option=com_content&view=article&id=577:rafael-correa-biography&catid=41:varieties&Itemid=61 (last visited Oct. 8, 2010).

[67]   *Rafael Correa Biography, supra* note 66.

[68]   Hendricks Decl. II Ex. A, CRS-163-02-02.

[69]   *Id.*

[70]   Dans Decl. Ex. 2, CRS-170-00-03.

charges against Chevron's attorneys. Donziger specifically suggested filing criminal charges against Pérez.[71]

This campaign continued. The outtakes show Donziger and others planning a press conference to pressure the Prosecutor General to bring criminal charges.[72] On the following day, Donziger asked that posters be made of "Texaco's four accomplices,"[73] including the Individual Petitioners – posters that later were displayed at a press conference and a demonstration.

In March 2007, President Correa pledged his full support for the Lago Agrio plaintiffs.[74] He followed that pledge with a meeting with Luis Yanza, co-founder of the Amazon Defense Front and a close ally of Donziger. In a telephone conversation on or about April 23, 2007, Yanza reported to Donziger and Fajardo on a conversation he had had with President Correa. To the extent that his report may be gleaned from the outtakes, Yanza told Donziger that President Correa had an interest in learning more about the alleged environmental harm and "fraud in the field."[75] Yanza added to Donziger that President Correa "insist[ed]" that he continued to "[think] about doing something in the Prosecutor's Office."[76] A day or two later, Yanza again reported to Donziger and Fajardo, asserting on that occasion that Yanza had "coordinat[ed] everything" with

---

[71]

    *Id.* Ex. 17.

[72]

    *Id.* Ex. 2, CRS-198-00-04.

[73]

    Hendricks Decl. II Ex. A, CRS-204-01-02.

[74]

    Dans Decl. Ex. 12.

[75]

    *Id.* Ex. 2, CRS-248-03-01.

[76]

    *Id.*

President Correa.[77]

Within a day or two, President Correa, Yanza, Fajardo, and others boarded a government helicopter together to tour the Oriente region.[78]  In a voiceover in *Crude*, Donziger bragged:  "We have achieved something very important in the case.  We are now friends with the President."  That "friendship" immediately became apparent.  On the same day as his visit to the Oriente region, President Correa issued a press release "urg[ing] the Office of the Prosecutor to permit the Prosecution of the Petroecuador officials who accepted the remediation carried out by Texaco."[79]

The fact that there was no mention of the Texaco lawyers apparently bothered Donziger.  In a telephone conversation the next day that was captured by Berlinger's cameras, Donziger said that "perhaps it is time to ask for the head of Pérez Pallares – given what the President said."[80]  On the following day, President Correa broadcast a call for the criminal prosecution of "Chevron-Texaco . . . homeland-selling lawyers" in addition to the prosecution of Petroecuador officials.[81]

On November 30, 2007, Ecuador's new Constituent Assembly, which at least then

---

[77]

*Crude*, 1:03:03.

[78]

Portions of President Correa's visit are depicted in *Crude* and the outtakes.

[79]

*Id.* Ex. 14.

[80]

Hendricks Decl. II Ex. A, CRS-268-00-01.

[81]

Dans Decl. Ex. 13.

was controlled by President Correa,[82] removed the Prosecutor General, who had found no basis to support criminal charges against the Individual Petitioners and former GOE officials, and replaced him with Dr. Washington Pesántez Muñoz.   Dr. Pesántez had been the District Prosecutor who had decided in March 2007 that "the report on the special audit conducted by the Comptroller General of Ecuador . . . showed that there was no evidence of civil, administrative or criminal nature liability on the part of . . . representatives of the TEXACO company, with respect to environmental damage that had allegedly been caused in the Amazon region."[83]   Several months later, however, Dr. Pesántez decided that the criminal case should be reopened.[84]

On March 31, 2008, less than a week after Cabrera reported a damages finding of $16 billion and a day before he filed his report with the court, the Individual Petitioners received notice that the new Prosecutor General had reactivated the criminal charges based on "new" evidence.[85] On July 31, 2008, representatives of the Lago Agrio plaintiffs, including Donziger, held a press conference during which one of the plaintiffs' representatives commented that the plaintiffs had presented evidence to the Prosecutor General's office to encourage an investigation.[86]   President Correa, in a radio address less than two weeks later, offered his support for the criminal prosecutions:

---

[82]
    *Ecuador Forum Dissolves Congress*, BBC NEWS (Nov. 30, 2007, 04:55 GMT), http://news.bbc.co.uk/2/hi/americas/7119373.stm.

[83]
    *Id.* Ex. 11, at 10.

[84]
    *See id.* Ex. 15.

[85]
    *Id.*

[86]
    *Id.* Ex. 16.

"But previous governments supported Texaco Chevron and betrayed our people: they signed agreements saying that everything was resolved, which has been one of the principal arguments by Texaco Chevron in its defense, when in fact nothing was resolved.  Now, the Prosecutor General (Washington Pesántez), has, very properly, opened an investigation to punish those people, because it was a lie:  there was nothing, nothing resolved, nothing cleaned up, all of the pollution."[87]

In June 2009, the Prosecutor General's office ordered Cabrera, in his capacity as the expert who conducted the environmental analysis regarding Texaco's presence in Ecuador, to give "free and unsworn" testimony.[88]  The Prosecutor General's office issued a statement a month later describing Cabrera's testimony.  The account of Cabrera's testimony included a description of the global assessment process.  Cabrera reportedly declined to comment explicitly on his conclusions, but he did refer the Prosecutor General to his report.[89]

The Individual Petitioners now face criminal charges in Ecuador.  On April 29, 2010, the Prosecutor General issued official accusations to the Individual Petitioners which were served approximately six weeks later.  A preliminary hearing, which will determine whether the action will proceed, now is scheduled for November 10, 2010.

## VI.    *The UNCITRAL Arbitration*

The United States and Ecuador are parties to a bilateral investment treaty (the "BIT").[90]  The BIT, broadly speaking, provides that private parties having investment disputes with

---

[87]

*Id.* Ex. 23.

[88]

*Id.* Ex. 19.

[89]

*Id.* Ex. 20.

[90]

*Investment Treaty With the Republic of Ecuador*, Aug. 27, 1993, S. Treaty Doc. No. 103-15.

Ecuador may pursue their claims in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law.[91]

In 2009, Chevron commenced an arbitration against Ecuador pursuant to the BIT. It there alleges that the GOE improperly colluded with the Lago Agrio plaintiffs in relation to the Lago Agrio litigation, abused the criminal justice system and engaged in other coercive tactics, and breached its investment agreements and treaty obligations.[92]  It seeks, among other things, declarations that Chevron and its affiliates have no liability with respect to the alleged environmental pollution, that Ecuador has breached the BIT and its treaty obligations in various respects, and indemnification from Ecuador for any liability Chevron may have in the Lago Agrio litigation.[107]

## VII.    *The Nature of Donziger's Activities*

As noted, Donziger was among the lawyers for the plaintiffs in the *Aguinda* case. When it was dismissed and the focus shifted to the Lago Agrio case in Ecuador, however, his role changed dramatically.  In his own words, "[w]hen the case shifted to Ecuador, really it became much more focused on lawyers in Ecuador.  It was not effective for American lawyers or the American legal team to run the case out of Ecuador."[108]  Donziger has described himself as the "link to all of

---

[91]

*Id.* Art. VI(3)(A), VI(4).

[92]

Hendricks Decl. I, Ex. EE, *passim.*

[107]

*Id.* at 17-18.

[108]

Hendricks Decl. II Ex. A, CRS-027-16-05.

the work in the United States and all of the institutional history of the case."[109]   An Ecuadorian representative of the Lago Agrio plaintiffs referred to Donziger as a "big help" because he was responsible for setting up some of strategies of the Lago Agrio plaintiffs.[110]   In a telephone conversation about a potential book deal, Donziger assured the person with whom he was speaking that he, Donziger, is "so much a part of the story that it would be hard for someone to do a book without [his] cooperation."[111]

Although Donziger and others have viewed Donziger as a member of the Lago Agrio legal team, the outtakes reveal that Donziger's activities have gone far beyond the rendition of professional legal services, even assuming that he has performed such services to any significant degree.  Donziger has made clear that the Lago Agrio litigation, in his words, is not a "legal case" but a "political battle . . . being played out through a legal case,"[112] a view that dovetails with his assessment of the Ecuadorian court system as entirely corrupt and driven by politics.  He has claimed that press strategy and relations are "as important, if not more important, than the lawyering that goes on in" the Lago Agrio litigation.[113]   In 2006, he described the next steps in the "battle" as getting "politics in order in a country that doesn't favor people from the rainforest" and said that "the country [has to be made] ready to deal with the idea that a judge can impose a multi-billion

---

[109]

  *Id.*

[110]

  *Id.*, CRS-027-16-03.

[111]

  *Id.*, CRS-151-03-02.

[112]

  *Id.*, CRS-060-00-04.

[113]

  *Id.*

dollar judgment on an American company."[114]  According to Donziger, it was important to mobilize the country politically "[s]o that no judge can rule against [the plaintiffs] and feel like he can get away with it in terms of his career."[115]

Donziger has served as the field general in this political battle.  Indeed when asked by a plaintiffs' consulting expert for a statement of the facts of the case, Donziger remarked that he had not done any legal work in nearly two years.[116]  While this comment perhaps was offered in a somewhat jocular vein, there is substantial truth to it.

On behalf of the Lago Agrio plaintiffs, Donziger, directly or indirectly, has lobbied the Ecuadorian and United States governments, raised money to support the litigation efforts, organized the plaintiffs' media campaign, and solicited and interacted with celebrity supporters. Donziger's statements, conduct, and demeanor in *Crude* and the outtakes, as well as other evidence, suggest that many of his activities have had little to do with the performance of legal services and a great deal to do with political activity, intimidation of the Ecuadorian courts, attempts to procure criminal prosecutions for the purpose of extracting a settlement, and presenting a message to the world media.  This becomes even clearer when one considers still other statements and incidents depicted in *Crude* and the outtakes.

A.    *The March 30, 2006 Intimidation of the Judge*

The outtakes depict Donziger and other plaintiffs representatives traveling to an *ex*

---

[114]
    *Id.*

[115]
    *Id.*, CRS-032-00-01.

[116]
    *See id.*, CRS-198-00-06.

*parte* meeting with a judge on March 30, 2006.  At least parts of the meeting appear in *Crude.*

Prior to the meeting, Donziger described his plan to "intimidate," "pressure," and "humiliate" the judge:

> "The only language that I believe this judge is going to understand is one of pressure, intimidation and humiliation.  And that's what we're doing today.  We're going to let him know what time it is. . . . As a lawyer, I never do this.  You don't have to do this in the United States.  It's dirty. . . . It's necessary.  I'm not letting them get away with this stuff."[117]

Donziger repeatedly referred to the Ecuadorian judicial system as "weak," "corrupt," and lacking integrity. He further explained to the camera:

> "The judicial system is so utterly weak. The only way that you can secure a fair trial is if you do things like that.  Like go in and confront the judge with media around and fight and yell and scream and make a scene.  That would never happen in the United States or in any judicial system that had integrity."[118]

### B.   The Plan to Pressure the Court With an "Army"

Over a year later, the *Crude* crew filmed a conversation between Donziger and Fajardo in which Donziger and Fajardo discussed the need to "be more and more aggressive" and to "organize pressure demonstrations at the court."   In the same clip, Donziger referred to the litigation as a "matter of combat" that requires "actually . . . put[ting] an army together."[119]

The outtakes captured a June 6, 2007 meeting in which Donziger outlined a strategy

---

[117]

    *Id.*, CRS-052-00-06.  This is not the first time that Donziger deployed such a strategy.  When an Ecuadorian judge would not allow Donziger to appear in court because he did not have his passport.  Donziger instructed an Ecuadorian attorney to lie and say that the judge called Donziger a "gringo."  *See id.*, CRS-046-02-01.

[118]

    *Id.*, CRS-053-02-01.

[119]

    *Id.*, CRS-346-00-02.

to pressure an Ecuadorian court.  Donziger told those present that the Lago Agrio plaintiffs needed to "do more politically, to control the court, to pressure the court" because Ecuadorian courts "make decisions based on who they fear most, not based on what the laws should dictate."[120]  Donziger expressed concern that no one feared the plaintiffs, and he stated that the plaintiffs would not win unless the courts begin to fear them.[121]  Donziger described also his desire to take over the court with a massive protest as a way to send a message to the court of "don't fuck with us anymore – not now, and not – not later, and never."[122]  He then proposed raising "our own army" to which Yanza interjected "a specialized group . . . for immediate action."[123]  At that point, Atossa Soltani of Amazon Watch interrupted and asked whether "you guys know if anybody can, uh, subpoena these videos."[124]  Donziger responded, "We don't have the power of subpoena in Ecuador."[125]  Soltani then asked "What about U.S.?," but Donziger interrupted her and ignored the question.[126]  She persisted, saying "I just want you to know that it's . . . illegal to conspire to break the law" to which Donziger said, "No law's been conspired to be broken."[127]  The conversation about raising an army to pressure

---

[120]    *Id.*, CRS-350-04-01.

[121]    *Id.*

[122]    *Id.*

[123]    *Id.*, CRS-350-04-02.

[124]    *Id.*

[125]    *Id.*

[126]    *Id.*

[127]    *Id.*

the court then continued, with Yanza waving the camera away as he told Donziger that the "army"could be supplied with weapons.[128]

Two days later, speaking directly to the camera, Donziger continued to emphasize the importance of pressuring the judge in the Lago Agrio litigation.  According to Donziger, the plaintiffs' "biggest problem" had been their inability to pressure the judge.  He explained that suing Chevron for moral damages or pressuring the Prosecutor General to open criminal investigations was not sufficient to make the judge feel pressure.[129]  Donziger asserted that the plaintiffs needed to do things that the judge would "really feel" such as being "called out" by the president of the country or the supreme court, implying that Donziger and others could develop strategies that would result in such actions.[130]

### C.    *Killing the Judge?*

Finally, Donziger participated in a dinner conversation about what might  happen to a judge who ruled against the Lago Agrio plaintiffs.  One or more other participants in the conversation suggested that a judge would be "killed" for such a ruling.  Donziger replied that the judge "might not be [killed], but he'll think – he thinks he will be . . . which is just as good."[131]

---

[128]

    *Id.*

[129]

    *Id.*, CRS-376-04-01.

[130]

    *Id.*

[131]

    *Id.*, CRS-129-00-02.

*Discussion*

Donziger and the Lago Agrio plaintiffs advanced several arguments in support of quashing the subpoenas, *viz.* that (1) the statutory and discretionary factors pertinent to Section 1782 applications were not satisfied, (2) the subpoenas are overbroad and unduly burdensome, (3) discovery from opposing counsel is disfavored, and (4) the information sought is privileged. The Court here sets out more fully its reasons for having denied the motions.

I.    *Judicial Code Section 1782*

Section 1782 of the Judicial Code provides in pertinent part:

> "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a . . . request made by a foreign or international tribunal or upon the application of any interested person . . . . A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."[132]

As stated in *Chevron I*, a district court is authorized to grant a Section 1782 application where (1) the person from whom discovery is sought resides or is found in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or "any interested person."[133] A district court, however, is not required to grant a Section 1782

---

[132]

28 U.S.C. § 1782.

[133]

*Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (quoting *In re Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (per curiam)).

application simply because it has the authority to do so.[134]  "Once the statutory requirements are met, a district court is free to grant discovery in its discretion."[135]

The Supreme Court has identified four discretionary factors to guide the Court's determination whether to grant a Section 1782 application: (1) whether the material sought is within the foreign tribunal's jurisdictional reach and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court jurisdictional assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests.[136]  In addition, "district courts must exercise their discretion under Section 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'"[137]

### A.    *Statutory Requirements*

Donziger is located in New York.  Chevron and the Individual Petitioners all are "interested" persons.  Chevron is a party to both the Lago Agrio litigation and the arbitration.  The

---

[134]

> *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004);  *In re Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006).

[135]

> *Schmitz*, 376 F.3d at 83-84.

[136]

> *Intel*, 542 U.S. at 264-65; *Microsoft Corp.*, 428 F. Supp. 2d at 192-93.

[137]

> *Schmitz*, 376 F.3d at 84 (quoting *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997)).

Individual Petitioners are facing criminal charges in Ecuador.  The Ecuadorian civil and criminal courts are foreign tribunals.  The BIT, a tribunal established by an international treaty, is a foreign tribunal for purposes of Section 1782 applications.[138]  Chevron and the Individual Petitioners therefore all have satisfied the threshold requirements of Section 1782.

### B.   Discretionary Factors

Donziger asserts that the discretionary factors weigh in favor of quashing the subpoenas.

The first three discretionary factors favor Chevron and the Individual Petitioners for the same reasons set out in *Chevron I*,[139] and there is no need to repeat that analysis in full.

First, like Berlinger, Donziger is located in this district and is not a party to any of the foreign proceedings.  Neither the Ecuadorian courts nor the arbitral tribunal is empowered to compel Donziger to testify and produce documents.  Indeed, Donziger, in a moment caught in the *Crude* outtakes, bragged that there is no "power of subpoena" in Ecuador.[140]

To be sure, Donziger is correct in arguing that the specifications describing the documents sought from him by these subpoenas probably describe also materials in Cabrera's possession.  But that would not be a satisfactory answer, even assuming that Cabrera has some responsive materials and that they could be obtained by the Ecuadorian courts.  Donziger's (and Cabrera's) documents in any case would be beyond the reach of the BIT tribunal.  Even more

---

[138]

*Chevron I*, 709 F. Supp. 2d at 291.

[139]

*Id.* at 291-93.

[140]

Hendricks Decl. II Ex. A, CRS-350-04-02.

important, the outtakes contain evidence that (1) the Lago Agrio plaintiffs were involved in *ex parte* communications with the Ecuadorian court to obtain Cabrera's appointment, and (2) Donziger and others working with him (a) met secretly with Cabrera prior to his appointment and outlined a detailed plan for his work, at least a good part of which appears to have been performed by the plaintiffs' own consultants, and (b) wrote some or all of Cabrera's report. Whatever may be in Cabrera's files, it is quite likely that the primary source of responsive material lies in Donziger's hands. Moreover, even if some responsive documents are in Cabrera's possession and could be reached by the Ecuadorian courts, it must be borne in mind that the subpoenas seek not only Donziger's files, but also his testimony. There is every reason to believe that Donziger is in a unique position to shed light on what in fact has happened in relation to this seemingly sordid tale.

The second of the discretionary factors also favors the applicants, as evidenced by the fact that numerous district courts have granted Section 1782 applications in connection with matters pending in Ecuadorian courts, including the Lago Agrio litigation.[141] Moreover, even if the Ecuadorian courts opposed these subpoenas, which they have not, such opposition would not be dispositive. That is especially so in light of the fact that Chevron and the Individual Petitioners seek relief here, in part, out of concerns regarding inappropriate influence in both the Lago Agrio

---

[141] *See, e.g., Chevron I*, 709 F. Supp. 2d 283; *In re Application of Chevron Corp.*, No. 1:10-mi-00076 (N.D. Ga. Mar. 2, 2010) (Calmbacher); *Chevron v. Stratus Consulting, Inc.*, No. 10-cv-00047 (D. Colo. Mar. 4, 2010); *In re Application of Chevron Corp.*, No. 4:10-mc-134 (S.D. Tex. Apr. 5, 2010) appeal docketed, No. 10-20389 (5th Cir. June 11, 2010) (3TM); *In re Application of Chevron Corp.*, No. 2:10-cv-02675 (D.N.J. June 15, 2010), appeal docketed, No.10-2815 (3d Cir. June 18, 2010) (UBR); *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (WMc) (S.D. Cal. June 23, 2010) (E-Tech); *In re Application. of Chevron Corp.*, No. 1:10-mc-00371 (D.D.C. July 22, 2010) (Wray); *In re Application of Chevron Corp.*, No. 3:10-cv-00686 (M.D. Tenn. Aug. 17, 2010), appeal docketed, No.10-6035 (6th Cir. Aug. 25, 2010) (Quarles); *Chevron Corp. v. Champ*, No. 1:10-mc-0027-GCM-DLH (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp.*, No. 10-MC-21JH/LFG (D.N.M. Sept. 1, 2010) (Kamp).

litigation and the criminal proceedings.[142]  Finally, sight must not be lost of the role of the discovery

sought here in respect of the BIT arbitration.  Certainly this discovery would be helpful to that

tribunal.

       Third, it is not likely that discovery pursuant to these applications would  undermine

Ecuadorian proof gathering.  As noted, there is no basis for concluding that either the Ecuadorian

court or the arbitral tribunal could compel Donziger to produce documents or testify.  Donziger is

not a party to those proceedings.  Any testimony given or materials produced by Donziger could be

offered in the arbitration and supplement the existing record in Ecuador, thus providing a more

complete picture than appears to be before the Ecuadorian court.

       The fourth discretionary factor – whether  the additional disclosure sought would be

intrusive or burdensome – overlaps with Donziger's objections based on his claim that he is an

attorney adverse to Chevron and that whatever he knows or has is protected by the attorney-client

privilege or work product doctrine.  Accordingly, the Court proceeds to those issues.


## II.    Deposition of Adverse Counsel

       "Courts have been . . . concerned about the burdens imposed on the adversary process

when lawyers themselves have been the subject of discovery requests, and have resisted the idea that

lawyers should routinely be subject to broad discovery."[143]  Despite that concern – which has been

born also of a reluctance to intrude on the attorney-client relationship and a sense that depositions

---

[142]

      *See, e.g., Chevron I*, 709 F. Supp. 2d at 292 .

[143]

      *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) (hereinafter *In re Friedman*).

of adversary counsel are unseemingly – our Circuit has adopted a "flexible approach" that affords district courts discretion to permit such discovery when appropriate rather than prohibiting or more severely restricting discovery of adverse counsel.[144] Indeed, it has made clear that "the disfavor with . . . the practice of seeking discovery from adversary counsel is . . . not a talisman for the resolution of all controversies of [that] nature."[145] Rather, district courts in such cases are to "consider[] all of the relevant facts and circumstances," including:

> "[1] the need to depose the lawyer, [2] the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, [3] the risk of encountering privilege and work-product issues, and [4] the extent of discovery already conducted."[146]

The Court considered all of these factors in exercising its discretion to decline to quash the subpoenas.

### A.    *The Need to Depose Donziger*

The Individual Petitioners are faced with a criminal prosecution that appears to have been instigated by Donziger and others working with him for the base purposes of coercing Chevron to settle and undermining a significant element of its defense in Ecuador, the release it obtained from the GOE. Chevron itself is attempting to pursue its arbitration before the BIT tribunal and to defend itself in the Lago Agrio litigation. There is substantial evidence that Donziger and others working with him have improperly (1) pressured, intimidated, and influenced Ecuadorian courts, (2) colluded

---

[144]          *Id.* at 69-72.

[145]          *Id.* at 71.

[146]          *Id.* at 72.

with Cabrera to substitute their own biased work product for the neutral and impartial assessment that Cabrera was appointed to produce, (3) concealed that role, (4) submitted to the Ecuadorian court over the signature of Dr. Calmbacher a report that Dr. Calmbacher denies having written, and (5) colluded with the GOE. *Crude* and the *Crude* outtakes – most notably Donziger's own words – as well as other evidence obtained in other Section 1782 proceedings, make clear that Donziger is a central figure in all of this. As Donziger himself said in promoting a book deal about the Lago Agrio litigation, he is "so much a part of the story that it would be hard for someone to do a book without [his] cooperation."[147]

In short, this is not an attempt to take the deposition of a lawyer in a routine civil case, attempts that often are made out of pique and personal animosity. The stakes here are huge both for the Individual Petitioners and for Chevron. The evidence of irregularities is powerful. Donziger's central role is undeniable. The need for his testimony and documents is very strong indeed.

### B.    *Donziger's Role*

The second of the *Friedman* factors focuses on the role of the lawyer from whom discovery is sought both in the litigation in question and in relation to the subjects on which disclosure is sought. The first of these considerations bears on the extent to which the discovery would disrupt the litigation by injecting one of the lawyers charged with its conduct into the case as a witness or by making the advocate's conduct or knowledge an issue in the proceeding. The second goes at least in part to the issue whether the lawyer is likely to have first-hand evidence that

---

[147]    Hendricks Decl. II Ex. A, CRS-151-03-02.

is important to the resolution of the lawsuit. Both of these considerations cut strongly against quashing the subpoenas.

It is important to recognize at the outset that Donziger is a New York, rather than an Ecuadorian, lawyer. He most assuredly is not litigating the criminal charges against the Individual Petitioners, which are in the hands of the GOE. While he is involved with the Lago Agrio plaintiffs' Ecuadorian lawyers and experts in the civil case, he is not conducting that case in the Ecuadorian courts. Perhaps even more significant, there is abundant evidence that Donziger's role in connection with events in Ecuador has been at least primarily in capacities other than that of an attorney.

The Court understands that some of Donziger's statements may have reflected some degree of hyperbole. No doubt he has brought his legal training to bear from time to time. But it remains the case that his role in Ecuador has gone far beyond the rendition of professional legal services. Courts would have no hesitation in allowing otherwise appropriate discovery of lay lobbyists, public relations consultants, media representatives, and political organizers. There is no sound reason for reaching a different result where someone with a law degree engages in similar activities. Indeed, as is shown below, it is well settled that the attorney-client privilege does not extend to communications involving a lawyer where the lawyer is engaged in such activities. That principle is instructive here.

Nor is this a case in which the applicants have sought discovery of Donziger to gain access to information that he gathered in the manner in which litigating counsel, lacking personal knowledge of any of the facts at issue in the lawsuit, normally gather information – interviewing witnesses and reviewing documents and other evidence. Rather, the proposed discovery focuses on matters concerning which Donziger is a percipient witness and a principal actor. In other words, the discovery is sought to shed light on what Donziger and those working with him did, allegedly

in corrupting the process in Ecuador.  The special solicitude ordinarily shown to litigation counsel with respect to discovery in the cases that they handle is unwarranted in these circumstances.

### C.      Extent of Discovery Already Conducted

District courts have granted Chevron Section 1782 applications in a number of other cases, chiefly involving U.S. environmental consultants involved in the Lago Agrio plaintiffs' efforts in Ecuador.  Nevertheless, the outtakes demonstrate that this application is unique.  Donziger appears to have played a central role in questionable aspects of the Lago Agrio litigation and related events.  Those previously subjected to Section 1782 discovery would have had no more than fragmentary knowledge of some of the matters at issue.  The Court is unaware that any of the Section 1782 witnesses save Berlinger, for example, had any knowledge at all concerning the attempts to intimidate and pressure the Ecuadorian judiciary, the interactions with the Ecuadorian government, or the criminal prosecutions.  The fact of the matter is that Donziger appears to be the leading man in this play.  No one will have much of a sense of the overall plot by seeing and hearing only the lines of those few members of the supporting cast who reside in the United States and have been examined under Section 1782.

### D.      Risk of Encountering Privilege and Work-Product Issues

The fourth of the factors articulated in *Friedman* is the risk that proceeding with the deposition of adverse counsel would encounter privilege and work-product issues.

Of course, Donziger has attempted to invoke both attorney-client privilege and work product in an effort to head off any discovery against him.  So too might any attorney faced with a demand for his or her documents or deposition.  Hence, there is a risk that a court will have to

resolve such claims whenever a litigant seeks a deposition of adverse counsel.  But the Second Circuit in *Friedman* rejected any *per se* rule against even depositions of active litigation counsel.[148] Indeed, it rejected the Eighth Circuit's view that a litigant seeking a deposition of adverse counsel must demonstrate, *inter alia*, that "the information sought is relevant and not privileged."[149]  Rather, it "requires a flexible approach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances . . . [which] may include . . . the risk of encountering privilege and work product issues."[150]  As every such case entails at least some risk of encountering such issues, what is required is a sensitive consideration of the extent to which substantial privilege issues are raised, their likely merit or lack thereof, and whether the effort that would be required to resolve those issues would be outweighed by the need for the discovery of whatever non-privileged information the lawyer may have.  Naturally, the first step in this analysis is to focus on the scope of the attorney-client privilege and the work product doctrine, each of which is considerably narrower than is implied by the capacious claims made by Donziger.

### 1.    Basic Principles

A party invoking the attorney-client privilege has the burden of showing, as to each allegedly privileged communication, that the communication was (1) between counsel and client,

---

[148]

> *See In re Friedman,* 350 F.3d at 71 ("the disfavor with which the practice of seeking discovery from adversary counsel is regarded is not a talisman for the resolution of all controversies of this nature").

[149]

> *Id.* at 70-72.

[150]

> *Id.* at 72.

(2) intended to be and remained confidential, and (3) made for the purpose of providing or obtaining legal advice.[151] The "predominant purpose" of a communication must involve legal advice.  A court should determine predominant purpose of a communication "dynamically and in light of the advice being sought or rendered, as well as the relationship, between advice that can be rendered only consulting the legal authorities and advice that can be given by a non-lawyer."[152] A lawyer's "dual legal and non-legal responsibilities may bear on whether a particular communication was generated for the purpose of soliciting or rendering legal advice."[153]

This latter point is especially significant in this case.  As demonstrated above, Donziger – at least in major respects – has not functioned as a lawyer with respect either to the Lago Agrio litigation or the criminal prosecution.  As *Crude* and the outtakes make clear, his efforts have been concentrated heavily in media and public relations, lobbying, and political activism.  But communications, even between lawyer and client, are not privileged unless they are made for the purpose of rendering legal advice[154] or, to use another formulation, unless they relate to the rendition of "professional legal services."[155]  Hence, the attorney-client privilege does not apply to communications with respect to many of the activities in which Donziger has engaged, at least in

---

[151]  *United States v. Const. Prod. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996).

[152]  *In re County of Erie*, 473 F.3d 413, 420-21 (2d Cir. 2007).

[153]  *Id.* at 421.

[154]  *Const. Prod. Research, Inc.,* 73 F.3d at 473.

[155]  SUP. CT. STD. 503.

the absence of very unusual circumstances.[137]

The work product doctrine is comparable in this respect.  It "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."[138]  Its purpose "is to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."[139]  It is not intended, however, to obscure "what [i]s essentially a lobbying and political effort," even one undertaken by a lawyer.[140]  Put another way:

> "If a lawyer happens to act as a lobbyist [or in some other capacity], matters conveyed to the attorney for the purpose of having the attorney fulfill the lobbyist [or other] role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice to the client, including advice on matters that may also be the subject of lobbying [or other non-

---

[137]

See, e.g., NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 130 (N.D.N.Y. 2007) (when an attorney is "wearing multiple hats and . . . advising . . . on anything and everything other than legal services, whether business, media, public relations, or lobbying, there is no attorney-client privilege"); Haugh v. Schroder Inv. Mgmt. North America Inc., No. 02 Civ. 7955, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("A media campaign is not a litigation strategy. Some attorneys may feel it is desirable at times to conduct a media campaign, but that does not transform their coordination of a campaign into legal advice."); In re Grand Jury Subpoenas dated March 9, 2001, 179 F. Supp. 2d 270, 274, 290 (S.D.N.Y. 2001) (communications with lawyers acting as lobbyists not privileged); City of Springfield v. Rexnord Corp., 196 F.R.D. 7, 9 (D.Mass. 2000) (documents prepared to respond to media inquires not privileged); Burton v. R.J. Reynolds Tobacco Co., Inc., 170 F.R.D. 481, 487 (D.Kan. 1997) ("The fact that the client chose to channel the work through an attorney rather than perform the work with non-legal personnel does not provide the basis for a claim of privilege.").

[138]

In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002, 318 F.3d 379, 383 (2d Cir. 2003).

[139]

United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir.1998) (quoting Hickman v. Taylor, 329 U.S. 495, 511 (1947)).

[140]

In re Grand Jury Subpoenas dated March 9, 2001, 179 F. Supp. 2d at 290 (no work product protection for lawyers involved in seeking a pardon, a political and lobbying enterprise).

legal] efforts."[141]

### 2. *The Normal Means of Claiming Privilege*

Not only is it important to have a proper regard for the scope and limits of the attorney-client privilege and the work product doctrine, but it is vital also to bear in mind the extent to which the motions to quash sought a wholesale departure from the normal manner in which such claims of immunity from disclosure are adjudicated.

There is a well-established procedure for the invocation of alleged privileges in response to subpoenas and other demands for tangible evidence. Those in possession, custody or control of allegedly privileged documents called for by subpoenas and document requests are obliged to enumerate the documents as to which they claim privilege and assert their privilege claims in the manner prescribed by both local and federal rules.[142] In most circumstances, a party cannot rely on "mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed."[143]

Where a party seeks disclosure from a witness who may have relevant information concerning allegedly privileged attorney-client communications, the fact that the witness may be asked questions that call for information as to privileged communications does not protect a witness

---

[141]

    *Id.* at 285 (quoting EDNA STEIN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE & THE WORK PRODUCT DOCTRINE 239 (2001)) (internal quotation marks omitted).

[142]

    FED. R. CIV. P. 26(b)(5)(A); S.D.N.Y. CIV. R. 26.2.

[143]

    *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir.1965)).

from being deposed or called to testify at a trial or before a grand jury.[144]  Rather, the witness must appear and give testimony.  When a question seeking disclosure of allegedly privileged material is posed, however, the holder of the alleged privilege may object and delay disclosure until a court rules on the objection.  When an objection is made the party seeking disclosure nevertheless is entitled to discover the dates and places of and the identities of the participants in the communications, the identities of others who were present and to whom the communications were disclosed, and the general subject matter (but not the content) of the communications.[145]  This permits the party seeking disclosure and, if need be, the court to know which communications are at issue, something about their general nature, whether they in fact were confidential, and whether any privilege has been waived by disclosure of the contents of the communications to persons other than the attorney and client.  Once such a record is developed, the court rules on the objection.

These procedures serve vitally important purposes.  The attorney-client privilege and the work product doctrine can serve to conceal highly relevant evidence that may be important to the just resolution of a controversy.  The burden of establishing their applicability therefore rests with the party asserting them.  Moreover, the adverse party has the right to challenge such assertions by pointing to a failure to satisfy their prerequisites or establishing waiver or some other reason for disclosure of otherwise protected evidence.[146]  Dispensing with the usual procedures effectively

---

[144]  *See* 24 Charles Alan Wright et al., Federal Practice and Procedure: Evidence § 5507, at 567 (2007) ("One cannot assert the privilege by a blanket refusal to testify; there must be specific objection to particular questions calling for privileged information.").

[145]  *See* Fed. R. Civ. P. 26(b)(5)(A); S.D.N.Y. Civ. R. 26.2.

[146]  For example, a party resisting a claim of privilege or work product could establish that the material in question is not protected by virtue of the crime-fraud exception.  Many claims of work product may be overcome by a showing of good cause for disclosure.  Fed. R. Civ.

absolves the claimant of the need to prove the applicability of the privilege or of work product protection and may deprive the adverse party of an effective means of disputing the claim or establishing an exception.

### 3.    Application to Donziger

With these principles in mind, we turn to Donziger's claims.

As an initial matter, there is considerable reason to doubt that there are any, or at least many, attorney-client communications involving Donziger and subject to the subpoenas.  Donziger has offered no proof of even a single communication between him and any of the Lago Agrio plaintiffs, let alone such a communication that was related to seeking or providing legal advice.  And that should not be surprising in light of the fact that Donziger is not licensed to practice law in Ecuador and is not conducting the Lago Agrio litigation.

Second, most of the discovery sought by the applicants is of communications involving third parties, such as the GOE and Cabrera, who have not been shown to be within any privileged relationship.[147]

Third, there is substantial evidence that suggests that Donziger's predominant role with respect to the matters in Ecuador is not the rendition of professional legal services, but politics,

---

P. 26(b)(3)(A).

[147]

The Lago Agrio plaintiffs attempt to avoid disclosure of communications between Donziger and others in their corner with the GOE on the theory that they have a common interest with the GOE and that this "protect[s] the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel."  But the existence of a common interest privilege has not been established.  Moreover, acceptance the common interest claim at this stage would have prevented Chevron and the Individual Petitioners from challenging the claim.

lobbying, and media and public relations. This may well be fatal to all his privilege and work product claims. Even if it is not fatal across the board, it may be fatal with respect to particular items of evidence.

Fourth, there is more than a little evidence that Donziger's activities – as several courts already have held in the context of Section 1782 applications against experts involved on the Lago Agrio plaintiffs' side – come within the crime-fraud exception to both the privilege and to work product protection.[148]

Even assuming that Donziger is not entirely without attorney-client privilege and work product protection for reasons already referred to, he may lack protection as to substantial categories of evidence. For example, there is evidence in *Crude*, the outtakes, and other Section 1782 proceedings that he has communicated with various experts in relation to the Lago Agrio litigation – knowledge or materials that might enjoy qualified work product protection. But even that is far from clear. Whatever has passed between him and Cabrera and other testifying experts is not subject to work product protection[149] even without regard to issues of waiver and the crime-fraud exception. And while interactions with non-testifying experts might enjoy work product

---

[148]

      *In re Chevron Corp.*, No. 10-MC-21JH/LFG [DI 11] (D.N.M. Sept. 13, 2010); *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (Wmc) [DI 9] (S.D. Cal. Sept. 10, 2010); *Chevron Corp. v. Champ*, No. 1:10-mc-0027-GCM-DLH [DI 12] (W.D.N.C. Aug. 30, 2010).

[149]

      *See, e.g., Lugosch v. Congel*, 219 F.R.D. 220, 250 (N.D.N.Y. 2003) ("[I]nformation considered by the [testifying] expert should be disclosed notwithstanding the presence of work product consideration."); *Mfg. Admin. & Mgmt. Systs., Inc. v. ICT Group, Inc.*, 212 F.R.D. 110, 115-16 (E.D.N.Y. 2002) (attorney work product not protected when shared with testifying experts); *MIC Commc'ns Corp. v. Dataline, Inc.*, No. 01 Civ. 3849(LAP) (DFE), 2001 WL 1335291, at *1 (S.D.N.Y. Oct. 30, 2001) (collecting cases); *B.C.F. Oil Ref. v. Consol. Edison Co.*, 171 F.R.D. 57, 66 (S.D.N.Y. 1997) (holding that attorney work product reviewed by a testifying expert is not protected by work product).

protection, there certainly has not been proof sufficient to conclude that such protection extends to any of the subpoenaed evidence. The protection may have been waived. The crime-fraud exception may vitiate any otherwise applicable protection, as at least one other court has held in another Section 1782 proceeding brought by Chevron to obtain discovery from an expert.[150] Moreover, most work product is not protected absolutely and is discoverable on a showing of good cause.[151] Chevron and the Individual Petitioners, assuming they knew enough about the specific evidence in question, might well be able to establish good cause and thus overcome any otherwise applicable protection.

In the last analysis, then, denial of the motions to quash these subpoenas will require adjudication of Donziger's claims of privilege. But there is good reason to believe that those claims are exaggerated and, at least in many cases, without merit or at least questionable. So the ultimate question on the motions to quash reduces to whether the applicants' need for whatever unprivileged material Donziger possesses is sufficiently great to make adjudication of the privilege claims a worthwhile endeavor.

In this Court's judgment, the need is extremely great in view of the extraordinary evidence already before it. To turn a blind eye to evidence suggesting improper influence on and intimidation of the Ecuadorian courts by both Donziger and the GOE, improper manipulation of the criminal process in that country, knowing submission by the Lago Agrio plaintiffs of at least one fraudulent report, and improper collusion with Cabrera, the supposedly neutral court-appointed

---

[150] *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (Wmc) [DI 9] (S.D. Cal. Sept. 10, 2010).

[151] *See* FED. R. CIV. P. 26(b)(3)(A).

expert, could defeat the purpose of Section 1782, deprive the Individual Petitioners of evidence needed for their defense in a criminal case, and frustrate the BIT arbitration.

Considering all of the facts and circumstances before the Court, including the need to resolve privilege issues, the fact that Donziger is a lawyer and that he is allied with Chevron's adversaries in the Lago Agrio litigation is not sufficient to warrant the quashing of these subpoenas. The proper course is to allow the process to go forward and to adjudicate the claims of privilege in due course.[152]

That is exactly what this Court's order provided. It held open the possibility of adjudicating the merits of his privilege claims with respect to the documents demanded notwithstanding his failure to comply with Fed. R. Civ. P. 26(b)(5)(A) and S.D.N.Y. Civ. R. 26.2. It appointed a special master to preside at the deposition in order to deal effectively and properly with any claims of privilege that may be made in response to specific questions. And it made clear that this Court ultimately stands ready to resolve whatever privilege claims may be made.

---

[152]

Donziger has advanced no persuasive reason why he should not be compelled to claim privilege in the same manner as any other litigant – providing a privilege log enumerating the documents as to which privilege is claimed, claiming privilege in response to deposition questions, and in each case providing such information as may be necessary to make out his claim. Although Donziger claims that a privilege review of his files would be "time consuming" and "complicated," the Court is not persuaded that he should not be required to conform to the usual rules because, among other things, (1) he has provided no estimate of the number of documents as to which he has colorable claims of privilege, (2) Chevron has dropped the one subpoena request that blatantly called for privileged information, Chevron Mem. 48, and (3) his evidence is so central to the applicants' interests. Moreover, it appears that there can be no viable claim of privilege with respect to large areas of the discovery sought because it involves communications between Donziger and unrelated third parties.

*III.    The Proposed Modification of the Subpoenas*

In the alternative, Donziger suggested that the Court limit the subpoenas to communications with Cabrera and Ecuadorian prosecutorial authorities.[153]  This proposal was  not persuasive.

First, Donziger's proposal would exclude Chevron Request 5, which relates to *ex parte* communications with Ecuadorian judges or judicial officers.  These communications are not subject to attorney-client privilege or work product because the communications were not made in confidence between lawyer and client and were not made to others in a privileged relationship either. These communications are highly relevant to extent that they might shed light on any alleged improper communications with that court.

Second, Donziger's proposal would narrow Chevron Request 6/Individual Petitioners Request 6 inappropriately.  Donziger suggested limiting the request to communications with Ecuadorian prosecutorial authorities.  Such a proposal, however, would exclude any inappropriate communications between those representing the Lago Agrio plaintiffs and other GOE officials, including the office of President Correa, regarding the criminal prosecution.

Third, Donziger's suggested modifications ignore the notion that alleged improper influence is not limited to direct communications with Cabrera and prosecutorial authorities. Chevron Requests 7-19, 23-24, 26/Individual Petitioners Requests 7-19, 21-22, 24,  relate to laboratories, environmental consulting firms, and specific consulting experts that might have been

---

[153]    Donziger Mem. 20.

involved with the alleged improper influence on the Cabrera report.[154]  Donziger's proposal would prevent discovery of such communications, which the Court views as highly relevant.  Furthermore, Donziger's proposal would ignore requests related to Cabrera that are relevant, but do not call for direct communications with Cabrera.  For example, Donziger may control documents regarding preparation for the "global assessment" that were not communicated directly to Cabrera but nonetheless would fall under Chevron Request 54/Individual Petitioners Request 41.  And Donziger may have non-privileged communications regarding the "global assessment," such as communications or documents exchanged with representatives of Amazon Watch or the GOE, as described in the outtakes.

Finally, the Court is not convinced that the subpoena would require "wholesale turnover" of Donziger's files related to the Lago Agrio litigation.  The Ecuadorian court appointed and swore Cabrera as the expert responsible for the "global assessment" in 2007.  Cabrera submitted his initial report approximately one year after his appointment and a supplemental report several months later.  As a result, many of the subpoena requests are effectively limited to a two-year period.  The Court is still not prepared to find that the subpoenas require modification or impose an undue burden on Donziger.

---

[154]   It must be borne in mind that there is evidence that the purpose of the March 3, 2007 meeting was to outline a work plan pursuant to which consultants hired by the Lago Agrio plaintiffs would at least contribute to and at worst write Cabrera's report.

*Conclusion*

For the foregoing reasons, as well as those set forth in the Court's prior ruling, the motions to quash the subpoenas were denied in the exercise of the Court's discretion.

SO ORDERED.

Dated:        November 4, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)