David W. Shapiro (SBN 219265)
dshapiro@bsfllp.com
Maxwell V. Pritt (SBN 253155)
mpritt@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone:      (510) 874-1000
Facsimile:      (510) 874-1460

Robert A. Mittelstaedt (SBN 60359)
ramittelstaedt@jonesday.com
Caroline N. Mitchell (SBN 143124)
cnmitchell@jonesday.com
David Wallach (SBN 233432)
dwallach@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:      (415) 626-3939
Facsimile:      (415) 875-5700

Attorneys for
CHEVRON CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* **Application of:**<br><br>**THE REPUBLIC OF ECUADOR,**<br><br>                    **Applicant,**<br><br>**For the Issuance of a Subpoena for the Taking of a Deposition and the Production of Documents in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782** | Case No. CV 10-80324 MISC CRB (EMC)<br>[Related Case CV 10-80225 MISC CRB (EMC)]<br><br>**CHEVRON CORPORATION'S OPPOSITION TO THE LAGO AGRIO PLAINTIFFS' APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782; AND, IF GRANTED, CHEVRON'S REQUEST FOR RECIPROCAL DISCOVERY** |
| **AND RELATED CASE** | |

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

# TABLE OF CONTENTS

I.   INTRODUCTION........................................................................................................1

II.  FACTUAL BACKGROUND ....................................................................................3

    A.  The Lago Agrio Litigation ................................................................................3

    B.  Misconduct and Judicial Fraud by the Lago Agrio Plaintiffs' Attorneys ....................5

        1. Judicial Coercion.......................................................................................6

        2. Fraudulent Expert Reports .......................................................................7

    C.  The Núñez Bribery Solicitation..........................................................................10

        1.The Contents of the Recordings .................................................................10

        2.The Lago Agrio Plaintiffs' and the ROE's Response to the Bribery Scheme .........12

        3.The Escobar Recordings ...........................................................................13

    D.  Improper Collaboration .....................................................................................15

        1.Collaboration Between the Lago Agrio Plaintiffs' Attorneys and the ROE in Civil Matters Enables Them to Abuse the § 1782 Process .................................................15

        2.Collaboration Between the Lago Agrio Plaintiffs' Attorneys and the ROE on Criminal Matters Enables the Lago Agrio Plaintiffs to Wield Prosecutorial Power 17

III. THE LAGO AGRIO PLAINTIFFS' COUNSEL APPEAR TO LACK AUTHORITY TO REPRESENT THE LAGO AGRIO PLAINTIFFS..........................................................21

IV.  THE LAGO AGRIO PLAINTIFFS' APPLICATION WAS BROUGHT IN BAD FAITH AND SHOULD BE DENIED IN THIS COURT'S EXERCISE OF ITS DISCRETION.22

    A. Standard.............................................................................................................22

    B. The Discretionary Factors Weigh in Favor of Denying The Application. .....................22

V.   ANY GRANT OF RELIEF TO THE LAGO PLAINTIFFS SHOULD BE CONDITIONED ON THEIR AND THE ROE ATTORNEY GENERAL'S PRODUCTION OF INFORMATION RELEVANT TO THE NÚÑEZ BRIBERY SCHEME AND ON CHEVRON'S ABILITY QUESTION THE WITNESSES.............23

CONCLUSION ..............................................................................................................25

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

# TABLE OF AUTHORITIES

**CASES**

*Aguinda v. Texaco, Inc.*,
  142 F. Supp. 2d 534 (S.D.N.Y. 2001). ...................................................................................4

*Chevron Corp. v. Berlinger*,
  --- F.3d ---, 2011 WL 102671 (2d Cir. Jan. 13, 2011) ............................................3, 5

*Chevron Corp. v. Shefftz*,
  --- F. Supp. 2d ---, 2010 WL 4985663 (D. Mass. Dec. 7, 2010)...........................................22

*In re Chevron Corp. ("Chevron II")*,
  --- F. Supp. 2d ---, 2010 WL 4910248 (S.D.N.Y. 2010)................................................. passim

*Donnelly v. Parker*,
  486 F.2d 402 (D.C. Cir. 1973) ............................................................................................21

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ...............................................................................................24

*In re Chevron Corp.*,
  2010 WL 4861351 (S.D.N.Y. Nov. 30, 2010) ...................................................................23

*In re Chevron Corp.*,
  2010 WL 4883111 (W.D. Va. Nov. 24, 2010)....................................................................22

*In re Chevron Corp.*,
  --- F. Supp. 2d ---, 2010 WL 3489341 (S.D.N.Y. 2010)...................................................2, 5

*In re Chevron Corp.*,
  No. 10-4699 (3rd Cir. filed Dec. 22, 2010) ........................................................................23

*In re Chevron Corp.*,
  2010 WL 4922312 (S.D.N.Y. Nov. 30, 2010) ....................................................................15

*In re Esses*,
  101 F.3d 873 (2d Cir. 1996)................................................................................................24

*In re Malev Hungarian Airlines*,
  964 F.2d 97 (2d Cir. 1992)..................................................................................................24

*In re Retail Chemists Corp.*,
  66 F.2d 605 (2d Cir. 1933)..................................................................................................21

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

*In re Sveaas*,
    249 F.R.D. 96 (S.D.N.Y. 2008) ............................................................................22

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ...............................................................................22, 24

*Lago Agrio Plaintiffs v. Chevron Corp.*,
    Nos. 10-cv-4341, 10-cv-4405 (2d Cir. Dec. 15, 2010) ................................... passim

*Meredith v. Ionian Trader*,
    279 F.2d 471 (2d Cir. 1960) ...............................................................................21

*Minatec Finance S.A.R.L. v. SI Group, Inc.*,
    2008 WL 3884373 (N.D.N.Y. 2008) ...................................................................24

*Pueblo of Santa Rosa v. Fall*,
    273 U.S. 315 (1927) ...............................................................................21

*Republic of Ecuador v. ChevronTexaco Corp.*,
    376 F. Supp. 2d 334 (S.D.N.Y. 2005) .......................................................... passim

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

## I.        INTRODUCTION

Chevron Corporation (Chevron) submits this opposition to the Lago Agrio plaintiffs' application for an order pursuant to 28 U.S.C. § 1782 for the issuance of subpoenas to Diego Borja and Sara Portilla for several reasons: (1) to correct numerous and serious misstatements of fact made by the Lago Agrio plaintiffs; (2) to ask that the Lago Agrio plaintiffs' application be denied because of their false statements and lack of good faith; (3) if the Application is not denied outright, then to ask the Court to defer granting the Application until Judge Lewis Kaplan (S.D.N.Y.) rules on whether the attorneys who purport to represent the Lago Agrio plaintiffs actually are retained by the named plaintiffs; and (4) if the Court ultimately authorizes the Lago Agrio plaintiffs or the Republic of Ecuador (ROE) to proceed with discovery of Borja and Portilla, to require that Chevron have equal time to question Borja and Portilla and to require that the Lago Agrio plaintiffs and the ROE Attorney General produce particular evidence described in Chevron's application.

Chevron is the target of litigation in Lago Agrio, Ecuador, purportedly brought on behalf of 48 Ecuadorians (Lago Agrio Litigation) claiming Chevron should pay billions of dollars to clean up allegedly contaminated areas of Ecuador.  For years, the American and Ecuadorian Lago Agrio plaintiffs have pursued a sham public relations and legal campaign to extort money from Chevron.  In their current application, the Lago Agrio plaintiffs castigate Chevron for "attack[ing]" the plaintiffs and their agents and attempting to derail their "pursuit of justice" by filing § 1782 applications in the United States.  They ignore the facts that every federal judge who has considered Chevron's requests has granted the applications and that those applications have uncovered devastating evidence of plaintiffs' fraud.  The Lago Agrio plaintiffs' attorneys, led by New York lawyer Steven Donziger, falsified evidence, corrupted judges on the Lago Agrio court, identified a false "expert" named Richard Stalin Cabrera Vega (Cabrera) and then ghostwrote his reports recommending that Chevron be ordered to pay $27.3 billion in damages, politically pressured Ecuador's Prosecutor General to prosecute two former attorneys for Texaco Petroleum Company (TexPet), and colluded with the ROE to investigate criminally Diego Fernando Borja Sánchez (Borja), an Ecuadorian citizen who exposed corruption in the Lago

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

1    Agrio Litigation.

2        Donziger and his team use tactics that he described as "a flat-out street brawl . . . only a

3    short step away from smashing the faces of our counterparts with a closed fist, or taking out

4    guns." Ex. 70, DONZ00006707 at 24.[1]  When the evidence of this "'inappropriate, unethical and

5    perhaps illegal conduct,'" came to light, it "'sent shockwaves through the nation's legal

6    communities'" in the words of one court.  *In re Chevron Corp.*, --- F. Supp. 2d ---, 2010 WL

7    3489341, at *1 (S.D.N.Y. 2010) (internal quotation marks omitted), *aff'd*, *Chevron Corp. v.*

8    *Berlinger*, --- F.3d ---, 2011 WL 102671 (2d Cir. Jan. 13, 2011).  The judge presiding over the

9    1782 proceedings in New York, Judge Lewis Kaplan, recently found "there is evidence to

10   support Chevron's claim that the 'global assessment' is a fraud . . . . Chevron thus stands in

11   jeopardy of a huge judgment that, if ultimately rendered, could be the result of a fraud practiced

12   by the Lago Agrio plaintiffs."  *In re Chevron Corp. ("Chevron II")*, --- F. Supp. 2d ---, 2010 WL

13   4910248, at *2 (S.D.N.Y. 2010), *see id.* At *6-8.  Chevron's 1782 discovery has exposed the

14   plaintiffs' tactics to dissemble and delay.  For example, in one email following a 1782 deposition

15   of one of plaintiffs' consultants who ghostwrote parts of the Cabrera report, a plaintiffs' attorney

16   boasts that the witness "did an excellent job of not remembering anything" and "did not

17   recognize any of his work." Ex. 71, DONZ00031206 at 1.  The same email warns that a side-by-

18   side comparison between the consultant's work and Cabrera's would "smell bad" to a judge.  *Id.*

19   Another email admits the attorneys' fear that their consultants' work will have to be produced

20   because, as a plaintiffs' attorney explains, one consultant's "notes suggest more coordination

21   with Cabrera than counsel simply dropping off two sets of the documents."  Ex. 72,

22   DONZ00031368 at 4.  The same attorney worries, in June 2010, that making misrepresentations

23   to the court will be viewed by Chevron as "a perpetuation of the fraud."  *Id.*  Yet others on the

24   plaintiffs' team urge "not admitting everything – only what we have to."  *Id.* at 2.  The plaintiffs'

25   misstatements to courts were so obvious that the Special Master overseeing the Donziger

26   deposition asked whether corrective statements had been filed with other courts.  Ex. 8, Donziger

27

28        [1]  Unless otherwise noted, citations to "Ex." are exhibits to the Declaration of Maxwell
     V. Pritt filed with this Opposition.

2

Depo. 2312:6-2313:10. Recognizing their jeopardy, plaintiffs were compelled to file corrective statements in at least two proceedings. Ex. 73, Pls' "Clarification of Docket #144", *Chevron Corp. v. Stratus,* No. 10-cv-00047 (D. Colo. Filed Jan. 7, 2011) (No. 306); Ex. 74, Pls' "Clarification of Docket #49", *Chevron Corp. v. 3TM Consulting, LLC,* No. 10-mc-134 (S.D. Tex. filed Jan. 7, 2011) (No. 106).

This is why Chevron has used §1782 to gather evidence; plaintiffs will admit "only what we have to" and it is only through the help of U.S. courts that the full dimension of the fraud has emerged. The Lago Agrio plaintiffs' instant § 1782 application motion shows that plaintiffs' dissembling has continued and they are willing to distort the truth in their zeal to damage Borja's credibility.

Finally, there is a serious question about whether the U.S. counsel appearing in proceedings on behalf of the Lago Agrio plaintiffs have ever been authorized by those plaintiffs to do so.

In 2009, Chevron initiated arbitration under the U.N. Commission on International Trade Law Rules pursuant to Article VI(a)(3) of the Bilateral Investment Treaty between the ROE and the United States (Treaty Arbitration) to seek redress from these and other serious abuses of its rights.

## II.     FACTUAL BACKGROUND

### A.     The Lago Agrio Litigation

In 1964, the ROE granted oil-exploration and production rights in the Oriente region of Ecuador to a consortium, in which TexPet participated. *E.g.*, ; "*aff'd*, *Chevron Corp. v. Berlinger*, --- F.3d ---, 2011 WL 102671 (2d Cir. Jan. 13, 2011); *Chevron II*, 2010 WL 4910248, at *5 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, Nos. 10-cv-4341, 10-cv-4405 (2d Cir. Dec. 15, 2010). TexPet operated the consortium's production activities until 1990, at which time Petroecuador, the ROE's state-owned oil agency, assumed those functions. *Chevron I*, 709 F. Supp. 2d at 285. In 1992, TexPet's 37.5% interests in the consortium expired, leaving it entirely owned by Petroecuador. *Id.* TexPet agreed with the ROE and Petroecuador to remediate a fraction of the oil production sites in the concession area commensurate with its

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

minority ownership stake. *Id.* at 286; *see Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2005) .

In 1993, 76 residents of the Oriente region filed a putative class action against Texaco in federal court in the Southern District of New York, seeking damages for "'property damage, personal injuries, and increased risk of disease'" allegedly caused by the consortium's operations in Ecuador.[2] *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001) (quoting complaint), *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002). The district court eventually dismissed the suit on *forum non conveniens* grounds, and the Second Circuit affirmed. *Id.* at 546.

In 1995, with the ROE's approval, TexPet hired Woodward-Clyde, one of the largest and most reputable environmental engineering firms in the world, to perform its share of environmental remediation in the concession area pursuant to the Settlement Agreement and Remedial Action Plan executed by the ROE and Petroecuador. *See* Ex. 1, Claimant's Request for Interim Measures, at 10-12, ¶¶ 23-26, and 14, ¶ 29. Then, in 1998, after TexPet spent $40 million for the remediation and various community development projects in Ecuador, and all responsible organs of the Ecuadorian government certified Woodward-Clyde's completion of TexPet's remediation obligations, the ROE and Petroecuador released TexPet and its affiliates from claims arising from the consortium's activities. *See id.* at 15-16, ¶¶ 30-34; Ex. 2, Final Compliance Document (Sept. 30, 1998); *see also Chevron I*, 709 F. Supp. 2d at 286; *Republic of Ecuador*, 376 F. Supp. 2d at 341-42. In 2001, Texaco became a wholly-owned subsidiary of Chevron. *Chevron II*, 2010 WL 4910248, at *5.

In 2003, attorneys who had filed the *Aguinda* lawsuit filed a new lawsuit in Lago Agrio, Ecuador, purportedly on behalf of 48 Ecuadorians, including some of the *Aguinda* plaintiffs, against Chevron—not TexPet or Texaco. *Chevron I*, 709 F. Supp. 2d at 286. This was not a re-filing of the *Aguinda* suit, as the Lago Agrio plaintiffs and the ROE claim in their § 1782

---

[2] Other complaints were filed against Texaco and/or TexPet in both the Ecuadorian courts and other federal district courts. *See Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538-39 (S.D.N.Y. 2001).

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

applications.  The Lago Agrio complaint did not, as the Aguinda complaint did, assert individual claims for personal injury or damage to private property.  Instead, it asserted "community" claims based on a 1999 Ecuadorian law (passed a year after the ROE completely released TexPet) for which the Lago Agrio plaintiffs' attorneys lobbied and which purportedly authorizes citizen suits to recover for generalized environmental damages—the same claims the ROE settled with TexPet.  *See Chevron II*, 2010 WL 4910248, at *6; *see also* Ex. 3, Gonzalo Solano, U.S. Lawyers Take $1 Billion Lawsuit Against Chevron Texaco to Ecuador, Associated Press (May 6, 2003).

**B.      Misconduct and Judicial Fraud by the Lago Agrio Plaintiffs' Attorneys**

During the past year, federal courts have authorized Chevron to obtain evidence relevant to the conduct of the alleged Lago Agrio plaintiffs' attorneys and the ROE in connection with the Lago Agrio Litigation.  As a result, Chevron has uncovered substantial evidence of misconduct by those attorneys, principally Steven Donziger, the Lago Agrio plaintiffs' "current lead counsel," Pls' Br. at 2, *In re Yaiguaje*, No. 10-mc-80324 (N.D. Cal. filed Dec. 30, 2010) (No. 2), and self-described "'link to all of the work in the United States and all of the institutional history of the case.'"[3]  *Chevron II*, 2010 WL 4910248 at *12 (quoting Donziger in an outtake from the film *Crude*).  American courts have recognized "inappropriate, unethical and perhaps illegal conduct," which has "sent shockwaves through the nation's legal communities" with the discovery of "substantial evidence of misconduct in and relating to the Ecuadorian litigation." *In re Chevron Corp.*, --- F. Supp. 2d ---, 2010 WL 3489341, at *1 (S.D.N.Y. 2010) (internal quotation marks omitted).  One court observed:  "While this court is unfamiliar with the . . . Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that

[3] Chevron uncovered Donziger's misconduct in part because in 2005, Donziger solicited Joseph Berlinger to make a documentary, later entitled *Crude*, that Donziger hoped would convince the American public to turn against Chevron.  *See generally Chevron I*, 709 F. Supp. 2d at 287.  The outtakes from *Crude*, which Chevron obtained through a § 1782 application, reveal that Donziger and other Lago Agrio plaintiffs' attorneys intimidated and improperly influenced judges in Ecuador, created false evidence, manipulated evidence, and colluded with, among others, the ROE, the Frente de Defensa de la Amazonía or Amazon Defense Front (Front), and Amazon Watch, fully undermining the credibility of the Lago Agrio Litigation. *See Chevron II,* 2010 WL 4922312, at *3, 6-14.

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

what has blatantly occurred in this matter would in fact be considered fraud by any court." *Chevron Corp. v. Camp* [sic], Nos. 10-mc-27, 10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010).  Some examples of that inappropriate, unethical, and illegal conduct are described below, because it is important for this Court to understand the true context in which the Lago Agrio plaintiffs, the ROE, and the ROE's Attorney General seek to invoke this Court's jurisdiction under § 1782 to obtain discovery.

### 1.      Judicial Coercion

The *Crude* outtakes and documents produced by Donziger reveal that he and other Lago Agrio plaintiffs' attorneys plotted to intimidate the Lago Agrio court to obtain favorable rulings. For example, the Lago Agrio plaintiffs' attorneys discussed using "pressure tactics" such as raising an "army" to surround the courthouse to send the court a clear message of "'don't fuck with us anymore—not now, and not—not later, and never.'"  *Chevron II*, 2010 WL 4910248, at *13 (quoting Donziger).  Such tactics were necessary, Donziger explained, because in Ecuador, "'[judges] make decisions based on who they fear the most, not based on what laws should dictate.'"  *Id.* (quoting Donziger in an outtake from *Crude*).  Thus, according to Donziger, "'[t]he only language . . . this judge is going to understand is one of pressure, intimidation and humiliation.  And that's what we're doing today.  We're going to let him know what time it is . . . . As a lawyer, I never do this.  You don't have to do this in the United States.  It's dirty . . . . It's necessary.'"  *Id.* at *4 (quoting Donziger); *id.* at *13 ("Donziger . . . stated that the plaintiffs would not win unless courts begin to fear them.").  Indeed, when one of Donziger's companions in the *Crude* outtakes suggests that no Ecuadorian judge would rule against the Lago Agrio plaintiffs because "'[h]e'll be killed,'" Donziger states that while the judge might not be killed, "'he thinks he will be . . . which is just as good.'"  *Id.* at *14.  As Donziger wrote in 2006: "[T]he only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us."  Ex. 4, DONZ00023089 at 14.  The Lago Agrio plaintiffs' attorneys' strategy of fear and intimidation worked: "The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. . . . The judge also . . . wants to forestall

6

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

the filing of a complaint against him by us, which we have prepared but not yet filed."  Ex. 5, DONZ00023182 (July 26, 2007 email from Donziger to co-counsel Pablo Fajardo); *see, e.g.*, Ex. 6, DONZ00027156 at 56 (Sept. 13, 2006 Donziger Note: "We wrote up complaint against [the Lago Agrio judge], but never filed it, while letting him know we might file it if he does not adhere to the law and what we need.").[4]

## 2.     Fraudulent Expert Reports

In their § 1782 application, the Lago Agrio plaintiffs assert that "tens of thousands of pages of reports have been submitted by experts" who were "appointed by the court."  Pls' Br. at 6.  Additionally, the ROE states in its application that "the court-appointed global damages expert filed a 4,000 page report and a follow-up report estimating damages in a range up to US $27.3 billion."  ROE Br. at 7.  However, as one district judge recently found, "that is not even remotely the whole story."  *Chevron II*, 2010 WL 4910248, at *6.  In reality, Donziger and others improperly "colluded with [Richard] Cabrera to substitute their own biased work product for the neutral and impartial assessment that Cabrera was appointed to produce" and then "concealed that role."  *Id.* at *17.

In December 2006, Donziger told an ally that "'[t]he judge is going to appoint a guy in Ecuador, um, to be the expert but really, you know, we'll be supporting him with the work.'"  *In re Chevron Corp.*, --- F. Supp. 2d ---, 2010 WL 4118093, at *2 n.12 (S.D.N.Y. 2010) (expanded and corrected by *Chevron II*, 2010 WL 4910248) (quoting Donziger).  "I asked [Fajardo] if he was 100% sure the judge would app[oin]t [Cabrera] . . . and he said yes[.]"  Ex. 6, DONZ00027156 at 13 (Feb. 27, 2007 Donziger Note).  In March 2007, Donziger, his co-counsel,

---

[4] The Lago Agrio plaintiffs' attorneys and their allies have also made it common practice to meet *ex parte* with judges in the Lago Agrio case under improper circumstances. *See, e.g.*, Ex. 6, DONZ00027156 at 6 (April 12, 2007 Donziger Note: "[M]et with judge in Lago on April 10. . . . Met in empty warehouse near his house . . . in Lago Agrio.  He seemed very agitated.  Said we were not helping him.  [Cabrera] needed to be [registered].");  *id.* at 3 (May 25, 2007 Donziger Note: "[Fajardo] called to ask if I would call the judge[] so we could go see him at his house.  I called the judge and he asked that we bring over some whiskey or some wine.");  *id.* at 11 (March 4, 2007 Donziger Note: "[Fajardo] and Luis [Yanza, President of the the Front,] met with the judge near the airport in his barrio in a restaurant.").

7

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

and "partisan experts" met with Cabrera,[5] a mining engineer with no relevant experience. *Chevron II*, 2010 WL 4910248, at *6.  Donziger wrote about the corrupt meeting:  "Technical meeting on Sat[urday] in office: Richard [Cabrera] [] there, as was [plaintiffs' experts] Ann [Maest], Dick [Kamp], and [Charles] Champ. . . . I spend the whole day making comments and mostly directing them to [Cabrera].  We laid out our entire case and legal theory – what a benefit!  We need to do the same with the judge."  Ex. 6, DONZ00027156 at 8-9 (March 7, 2007 Donziger Note).  Although Cabrera had not yet been appointed as the Lago Agrio court's "neutral" expert, Donziger and his cronies were already indoctrinating him.  *See Chevron II*, 2010 WL 4910248, at *7-8.  Donziger had even retained Stratus Consulting, Inc. (Stratus) and others in the United States to write Cabrera's report.  *See, e.g.*, Ex. 7, DONZ00028100 (Jan. 29, 2006 email exchange between Donziger and consultants Richard Kamp, Bill Powers, and Ann Maest, providing an outline of the work to be done for the "peritaje global").  Moreover, at the March 2007 meeting, co-counsel Fajardo admitted that "'*the work isn't going to be the expert's*'" and that Cabrera would just "sign the report and review it."  *Chevron II*, 2010 WL 4910248, at *7 & n.38 (quoting Fajardo) (emphasis in original).

On March 19, 2007, the Lago Agrio court appointed Cabrera to conduct the global damages assessment.  *See Chevron I*, 709 F. Supp. 2d at 287.  Cabrera was obligated under Ecuadorian law and ordered by the court to "perform his duties faithfully and in accordance with science, technology, and the law, with complete impartiality and independence vis-à-vis the parties."  *Chevron II*, 2010 WL 4910248, at *6 (internal quotation marks omitted).  But even Donziger recently admitted Cabrera was not "fully accurate" in his statement to the Lago Agrio court that he had, "in compliance with the orders issued by [the court,] . . . performed [his] work with absolute impartiality, honesty, transparency and professionalism."  Ex. 8, Donziger Depo. at 2287:18-2288:24.

---

[5] Cabrera is sometimes referred to as the "perito global" or "PG," which translated to English is "global expert."

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

Stratus coordinated consultants to ghostwrite Cabrera's report, which was delivered to Cabrera just days before his deadline to file it in the Lago Agrio court.[6]  *See Chevron II*, 2010 WL 4910248, at *8 n.52.; Ex. 8, Donziger Depo. at 2348:3-2349:4 (Donziger admits Cabrera did not write the report); *id.* at 2331:2-5 (Donziger admits "plaintiffs had done much more than provide documents to Cabrera").  Two law firms withdrew from representing the Lago Agrio plaintiffs upon learning the facts of Stratus' role in writing the Cabrera report.  *Id.* at 2384:6-2385:2.  In addition, Jonathan Abady, one of the Lago Agrio plaintiffs' attorneys, suggested in an email to Donziger and others that they should admit that "we authored portions of the report."  Ex. 9, DONZ00031368 at 3.

In March 2008, Cabrera issued the report as though it were his own, recommending that Chevron pay $16 billion in damages.  *See Chevron II*, 2010 WL 4910248, at *6.  In his deposition, Donziger could not point to *any* changes that Cabrera made to the report.  Ex. 8, Donziger Depo. at 2349.  The Lago Agrio plaintiffs then submitted comments purporting to criticize the Cabrera report as containing "omissions [that] are unjustly favorable to [Chevron]."  Ex. 10, at 40 (certified translation).  Cabrera responded with a supplemental report, also ghostwritten by the Lago Agrio plaintiffs' consultants, tacking on more than $10 billion for a total of $27.3 billion in damages.  *See Chevron II*, 2010 WL 4910248, at *6.  Powers, one of the Lago Agrio plaintiffs' consultants, confirmed that the answers he drafted to the questions the Lago Agrio plaintiffs raised about the Cabrera report were "substantively the same" as the answers that Cabrera submitted in his supplemental report in response to the plaintiffs' "objections."  Ex. 11, Sept. 10, 2010 Powers Depo. at 152:20-158:4, 162:5-166:19; 288:10-291:18.  The consultants then submitted a report claiming to have conducted an independent peer review of Cabrera's reports, and declaring Cabrera's approach was "reasonable" and his

---

[6]  When one of the consultants admitted they lacked evidence of pollution, Donziger explained it did not matter:  "Hold on a second, you know, this is Ecuador, okay.  You can say whatever you want and at the end of the day, [if] there's a thousand people around the courthouse, you're going to get what you want. . . . At the end of the day, this is all for the Court[; it's] just a bunch of smoke and mirrors . . . ."  *In re Chevron Corp.*, 2010 WL 4118093, at *3 (quoting Donziger).

9

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

conclusions were "consistent with actual cleanup costs and damages at other large environmental contamination cases around the world." Ex. 12, Comments on the Report of Court-Appointed Expert (Dec. 1, 2008) at 1, 8.

### C.     The Núñez Bribery Solicitation

In 2009, Diego Borja, an independent contractor who previously worked with Chevron, attended and recorded four meetings exposing a scheme involving then-Lago Agrio judge Dr. Juan Evangelista Núñez Sanabria (Judge Núñez) and persons associated with the ROE to solicit bribes from businesses seeking bioremediation work in Ecuador. *See* Exs. 16-19. These recordings and related evidence clearly reveal corruption in the Lago Agrio Litigation.

### 1.     The Contents of the Recordings

On May 11, 2009, Aulo Gelio Avila (a self-described associate of Judge Núñez), Patricio García (a political coordinator for the ruling party in Ecuador),[7] Ruben Dario Miranda Martinez (García's assistant), and Pablo Almeida (a remediation contractor) met with Borja and Wayne Hansen (a U.S. citizen). They discussed the anticipated proceeds of a multi-billion dollar judgment for the Lago Agrio plaintiffs, and Almeida explained that Alexis Mera, the Judicial Secretary to the Ecuadorian president, planned to form a government "executive unit" to handle the resulting remediation work in the Oriente region. Ex. 16, Tr. of May 11, 2009 Meeting at 24. But to participate in the remediation, according to Almeida, "[o]f course, you have to pay." *Id.* at 12.

Four days later, Borja, Hansen, Avila, and Almeida met with Judge Núñez—while he was presiding over the Lago Agrio Litigation—in his chambers in Lago Agrio. Judge Núñez

---

[7]  The Lago Agrio plaintiffs counsel falsely state that Garcia "the supposed representative of Alianza Pais" is "a car salesman with no connection to the party." Pls' Br. at 8, *In re Yaiguaje*, No. 10-mc-80324 (N.D. Cal. filed Dec. 30, 2010) (No. 2). However, Garcia stated in a radio interview that he is "a member of Movimiento Pais," and "work[s] in, let's say, a political environment, supporting campaigns." Ex. 13, La Luna Radio (Sept. 4, 2009). A police report by the Ecuador National Police confirmed that García works for Alianza Pais, "specifically at the campaign offices for the Alianza Pais Movement." Ex. 14, relevant excerpts of Police Report at 3; *see* Ex. 15, *Juez Nunez y un militante de AP aclaran su rol en videos*, El Universo (Sept. 9, 2009) (stating that "the district attorney's office has identified [García] as the Alianza PAIS political controller").

BOIES,  SCHILLER  &  FLEXNER  LLP

OAKLAND,  CALIFORNIA

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

explained that the case would be decided "about the end of the last months of this year." Ex. 17, Tr. of May 15, 2009 Meeting at 2.

On June 5, 2009, Judge Núñez met once again with Borja and Hansen. Ex. 18, Tr. of June 5, 2009 Meeting. Also in attendance was Juan Pablo Novoa, who identified himself as "counsel for a party, one might say that I'm, I'm the legal representative of the outside part of the government." *Id.* at 35. When Borja expressed concern about the outcome of the Lago Agrio Litigation, Judge Núñez cut him off, emphatically stating, "The amount of damages claimed by the indigenous people is twenty-seven billion dollars. Do you understand?" *Id.* at 11. Then, when Hansen said, "you say, Chevron is the guilty party," Judge Núñez responded, "Yes, Sir," and confirmed he would issue a ruling in the Lago Agrio Litigation in October or November of 2009. *Id.* at 34.

Following that meeting, on June 22, 2009, Borja met again with García and Miranda. Ex. 19, Tr. of June 22, 2009 Meeting. García told Borja about a conversation he had with President Correa's sister, Pierina, in which he "explained [to] her everything," including that they had twice met with the judge in the Lago Agrio case. *Id.* at 2. With respect to the portion of the bribe intended for the "plaintiffs"—$1 million—García explained that it would be "handled" by Alianza País (the Ecuadorian president's political party), with half of that money being paid to Pierina, whom he said wields significant influence as "the sister of the president of the Republic." *Id.* at 3, 6-7.

Borja provided recordings of the bribery scheme to Chevron. *See* Ex. 20, Statement of Diego Borja (Oct. 16, 2009), at ¶¶ 8, 11, 13, 14. Chevron then disclosed the recordings to authorities in the United States and Ecuador, and on its website relating to the Lago Agrio Litigation.[8] *See* Exs. 64-66. The Lago Agrio plaintiffs' attorneys and ROE officials responded

---

[8] Counsel allegedly representing the Lago Agrio plaintiffs falsely state to this Court that Chevron released only "heavily redacted" versions of the videos. Forensic experts for Chevron and Ecuador's Judicial Council have examined the recordings, which were provided by Borja to Chevron and released to the public, and determined they are authentic and have not been manipulated. *See* Ex. 24, Begault Decl. (Nov. 12, 2009), and Ex. 25, Rekalde Expert Report (Sep. 28, 2009). The plaintiffs' team also had the recordings examined by forensic experts, who determined they had not been "altered or edited or created"; this information

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

not by investigating, but by accusing Borja of fabricating the recordings on behalf of Chevron. Borja subsequently signed a statement and declaration affirming the authenticity of the recordings and averring that he, not Chevron, conceived of the idea to record the meetings, and that Chevron neither encouraged him nor directed him to attend the meetings.  *See* Ex. 20, Statement of Diego Borja (Oct. 16, 2009), at ¶¶ 15, 22; Ex.21, Decl. of Diego Borja (Dec. 7, 2009), at 1.  Chevron responded to Borja's security concerns by providing him relocation assistance.

### 2.  The Lago Agrio Plaintiffs' and the ROE's Response to the Bribery Scheme

After Chevron released the recordings of the bribery scheme, rather than heed the advice of plaintiffs' co-counsel Joseph Kohn to conduct an internal investigation into the Núñez bribery charges, *see* Ex. 8, Donziger Depo. at 2366:23-2367:22, Donziger hired a private investigator, Grant Fine, to investigate and discredit Borja.  On September 1, 2009, Kohn's partner wrote to Donziger "that instead of looking to dig up dirt, we should be focusing on making sure our own house is clean."  Donziger responded:  "[M]ore imp[ortant] is that we need to investigate chevron – come up with stuff we can give a congressional committee from a place like Kroll. They can look at Borja . . . ."  Ex. 28, DONZ00036695.  Similarly, the ROE—through its Prosecutor General—condemned Borja.  The Prosecutor General expressed little concern that a judge told others how he planned to rule in the biggest case in Ecuador's history.  Rather, he said he wanted to "ensur[e] that the ruling [in the Lago Agrio Litigation]  . . . is not the subject of any additional delays."  Ex. 29, Pesántez Press Conference (Sept. 4, 2009).  Although the Prosecutor General asked Judge Núñez to recuse himself, he did so because he did not want "additional delays or delegitimization by [Chevron], which is apparently seeking a reason not to pay [the

---

inexplicably was omitted from both the Lago Agrio plaintiffs' and the ROE's § 1782 applications.  *See* Ex. 26, Report of Stutchman Forensic Laboratory (Dec. 3, 2009), DONZ00015396-97.  Also, during an interview, García admitted he was on the recordings, *see* Ex. 13  La Luna Radio (Sept. 4, 2009), as did Judge Núñez, though he falsely claimed the recordings had been edited or manipulated, *see* Ex. 27, Answers to Oral Requests for Admissions by Judge Núñez (Nov. 18, 2009).

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

multi-billion judgment the Prosecutor General anticipates]." *Id.*  In other words, the chief criminal law enforcement officer of Ecuador was concerned not to delay the judgment the ROE seels.

Judge Núñez was investigated by Ecuador's Judiciary Council, which determined on October 27, 2010 that he should be removed from office and disbarred.  *See* Ex. 30, *Resolucion Destitucion Juez Núñez* (Oct. 27, 2010).  Not surprisingly given the corruption in Ecuador, barely three weeks later, the Judiciary Council reversed itself.  It stated, "if Judge Núñez has committed an offense, then he did it because Chevron induced him to, 'so to sanction only the Judge would be a disservice to justice and would be an attack on the law.'"  Ex. 31, Nov. 19, 2010 *Resolucion Revocatoria Destituicon Juez Núñez* at 3 (quoting plaintiffs' attorney Fajardo).

### 3. The Escobar Recordings

In their § 1782 applications to this Court, the Lago Agrio plaintiffs and the ROE quote extensively from statements that Borja allegedly made to Santiago Escobar, in a series of conversations via Skype and instant messaging.  Pls. Br. at 3, 10-12; ROE Br. at 13-15.  Although the Lago Agrio plaintiffs claim that these conversations were "automatically recorded," Pls. Br. at 10, that statement is false.  Escobar admits in his June 7, 2010 Ecuadorian "statement" that "[he] told [Borja] to call [him] on Skype, . . . and [Escobar] also downloaded, free of charge, the PAMELA recording system.  When we communicated with Diego Borja using this voice system, the PAMELA system automatically activated."  Ex. 32, June 7, 2010 Escobar Statement.[9]  Escobar thus intentionally recorded Borja.

The Lago Agrio plaintiffs and the ROE hold Escobar out as a good Samaritan who decided to record his conversations with Borja solely for altruistic reasons.  But that also is false.  Donziger's private investigator, Grant Fine, wrote a report dated December 7, 2009 that identifies Escobar as a member of a reportedly violent gang in Quito rumored to have killed someone.  Ex. 33, at DONZ00015388–90.  Fine's report about Escobar was publicly issued by

---

[9] Escobar's statement is replete with the first-person plural pronouns "us" and "we," indicating that he did not act alone in illegally recording Borja.  *See* Ex. 32, June 7, 2010 Escobar Statement.

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

the Lago Agrio plaintiffs, but the negative information about Escobar was omitted.  *See* Ex. 34, DONZ00018026 at 5, and Ex. 35, DONZ00029725 at 7-8; Ex. 36, Apr. 5, 2010 Report at 8.  The Lago Agrio plaintiffs cite to the sanitized report.  In addition, Fine determined that Escobar's father, who appeared with Escobar at a press conference and participated in a television interview discussing the recordings, was an advisor to Ecuador's highly politicized Constitutional Court.  *See* Ex. 37, DONZ00029657; Ex. 38, Amazon Defense Coalition Press Release (June 11, 2010); Ex 39, Escobar Interview on Gama TV (June 9, 2010).  Thus, it appears that there is a strong connection between Escobar and the ruling party in the ROE.

Furthermore, there is substantial reason to doubt the Lago Agrio plaintiffs' statement that Escobar voluntarily came forward with the information because he was unhappy with  Borja. Pls. Br. at 10.  It is far more likely that Escobar made the recordings for money and/or at the behest of persons associated with the Lago Agrio plaintiffs' scheme to extort money from Chevron.  Tellingly, although Grant Fine's December 7, 2009 report stated that Escobar never "inquire[d], directly or indirectly, whether he might stand to benefit in any way from releasing the evidence to us," that sentence was omitted from Fine's later, publicly issued report. *Compare* Ex. 33 at DONZ00015388–90 (Dec. 7, 2009 Fine Report) *with* Ex. 36, Apr. 5, 2010 Fine Report.

The Lago Agrio plaintiffs and the ROE fail to mention in their § 1782 applications that Escobar, in collusion with the Lago Agrio plaintiffs (or else lying about his connection to the Lago Agrio plaintiffs' and their allies), offered to pay-off Borja to change his account of what happened:

- Escobar: "You see, dude, I can advise, advise you politically and financially," Ex. 40, Tr. of Oct. 1, 2009 recording, 11:47 PM (Tr. 1) at 9;

- Escobar: "What would happen if you happen to go and you say: 'You know what? I was paid . . . .'" Ex. 23, Tr. of Oct. 1, 2009 recording, 12:21 PM (Tr. 3) at 1;

- Escobar: "Now I gave you the recipe, dude.  Now, shit! You have to give me a percentage of that, dick-face."  *Id.* at 7.

Escobar told Borja that he had "[d]irect access" to the Lago Agrio plaintiffs and their allies and that he would be Borja's "emissary" in discussions with them or members of the

14

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

Ecuadorian government, and that Borja could be paid as much as $30 million if he changed his story to hurt Chevron.  Ex. 41, Tr. of Oct. 1, 2009 recording, 13:17 PM (Tr. 7) at 4-5; Ex. 42, Tr. of Oct. 1, 2009 recording, 13:30 (Tr. 8) at 1; Ex. 43, Tr. of Oct. 1, 2009 recording, 13:49 PM (Tr. 10) at 7, 9.[10]

Tellingly, most of the Lago Agrio plaintiffs' allegations are uncorroborated by Escobar's recordings.  The Lago Agrio plaintiffs state that "Borja has admitted [t]o engaging in what he has described as a 'dirty tricks' operation," and that Borja admitted switching samples for Chevron. Pls. Br. at 3.  Only later do they mention in passing that Borja "told [this to] Escobar in person." *Id.* at 12.  Although Escobar recorded Borja for hours, Borja never made these statements during those conversations.

### D.   Improper Collaboration

#### 1. Collaboration Between the Lago Agrio Plaintiffs' Attorneys and the ROE in Civil Matters Enables Them to Abuse the § 1782 Process

Judge Kaplan recently found that "[t]here is substantial evidence that Donziger and others working with him have improperly . . . colluded with the [ROE]," *Chevron II*, 2010 WL 4910248, at *17.  He determined that the Lago Agrio plaintiffs and the ROE have formed an "alliance . . ., which has both financial and political interests in the success of the lawsuit," *In re Chevron Corp.*, No. 10-mc-00002, 2010 WL 4922312, at *1 (S.D.N.Y. Nov. 30, 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, Nos. 10-cv-4341, 10-cv-4405 (2d Cir. Dec. 15, 2010) (affirming "substantially for the reasons stated by the District Court" and "not[ing] the exemplary manner in which the able District Judge [] discharged his duties").  Judge Kaplan also found that "[t]he [ROE] has been working closely with Donziger for years and stands to gain

---

[10] The Lago Agrio plaintiffs and the ROE also fail to mention that Borja repeatedly confirmed his account of the real corruption in Ecuador.  For example, Borja told Escobar that "the videos and all that wasn't altered at all, I'm telling you I made them."  Ex. 44, Message Log of Sept. 4, 2009, at 6.  When Escobar asked Borja what he would say to the Attorney General if he was asked "if it's true that you induced the people in the video to say the script that you prepared previously," Borja said "No."  Ex. 45, Tr. of Oct. 1, 2009 recording, 23:59 PM (Tr. 19), at 3.  He also told Escobar that his "objective always was to expose that type of corruption."  *Id.*

15

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

billions for Ecuador if the Lago Agrio plaintiffs prevail against Chevron." *Id.* at \*11.  For example, as Donziger wrote to co-counsel, "I am going to Quito on Sunday—primarily to organize the fraud evidence for Winston, and to plan the next round of inspections."  Ex. 48, DONZ00023324 (Aug. 22, 2006 email from Donziger to Kohn); *see* Ex. 46, DONZ00025298 (Oct. 24, 2007 email from Donziger to Eric Bloom and others at Winston & Strawn, with a list of seven things that "we are thinking we want out of the meeting with the [Attorney General]"); Ex. 47, DONZ00028714 (Jan. 3, 2010 email from Donziger's associate, Andrew Woods to Donziger stating "E[ric] B[loom] comments attached, N[eil] M[itchell] comments copied below," with attachment titled "motion_to_stay_arbitration_track.DOC" and substantive comments on motion in body of email).

Indeed, although the named plaintiffs in the Lago Agrio case are individual Ecuadorian citizens, Washington Pesántez, the Prosecutor General of Ecuador, stated in 2009 that 90% of the proceeds from any judgment against Chevron would be delivered to the State.  *See* Ex. 29, Press Conference by Prosecutor General Washington Pesántez (Sept. 4, 2009); *Chevron I*, 709 F. Supp. 2d at 287 (same); *Chevron II*, 2010 WL 4910248, at \*6 (same).  Additionally, Petroecuador has provided at least $100,000 to the Lago Agrio plaintiffs to fund studies for use in the Lago Agrio Litigation.  *See* Ex. 49, DONZ00023859 (Sep. 18, 2006 memorandum from Donziger to Kohn); Ex. 50, DONZ00026841 (stating that the ROE might provide funds to the Lago Agrio plaintiffs through Petroecuador).  And as Donziger explained in 2000, the Lago Agrio plaintiffs' attorneys discussed with the ROE the potential for the ROE to "receive funds that might come out of a possible settlement."  Ex. 51, DONZ00023834 (Oct. 31, 2006 email exchange between Donziger and Bloom).

Through this collaboration, the Lago Agrio plaintiffs' attorneys and the ROE apparently planned to use the offices of the ROE to seek discovery for use in the Lago Agrio case since the Lago Agrio plaintiffs' attorneys have for the past year taken the position that § 1782 may not be used for the Lago Agrio case or the Treaty Arbitration.   A July 2010 memorandum in Donziger's document production entitled "Assessment of potential § 1782 Applications In Aid of

Lago Trial"; lists the Borja application.[11]  Ex. 53, DONZ00026937.  Donziger also produced a document called "Master Task List" dated July 29, 2010, which notes that "draft[ing] the 1782 complaint" for the "Borja/Portilla § 1782 actions" was "TBD."  Ex. 54, DONZ00031412 at 7. Donziger's press consultant, Karen Hinton, asked Donziger:  "Who can subpoena Borja?  Or depose him?  Can B[l]oom's firm depose him based on the arbitration litigation or some other reason[?]  Could you or the law firm that filed the arbitration?"  Ex. 55, DONZ00029884.  The ROE filed the § 1782 subpoena directed at Borja less than two months later.  Only when Borja moved to reconsider the denial of his motion to quash the ROE's subpoena, and this Court set that motion for hearing, did the Lago Agrio plaintiffs file their own § 1782 motion, abandoning their long held position that the statute could not be used in support of the Lago Agrio litigation or the Treaty Arbitration.

### 2. Collaboration Between the Lago Agrio Plaintiffs' Attorneys and the ROE on Criminal Matters Enables the Lago Agrio Plaintiffs to Wield Prosecutorial Power

More disturbingly, the Lago Agrio plaintiffs' attorneys/ROE collaboration has enabled the Lago Agrio plaintiffs to abuse the ROE's prosecutorial powers.  For example, at Donziger's team's repeated urging, the ROE revived previously rejected criminal charges against two former TexPet attorneys (current Chevron attorneys) who signed the release between the ROE, Petroecuador, and TexPet in 1998.  For example, in a February 4, 2009 email, Juan Pablo Sáenz (who posted the "Escobar" recordings online) wrote to Donziger:  "Dude, if [Chevron's attorneys] get a hold of this, it's gonna hurt us.  It's pretty much irrefutable evidence of us collaboration with the Fiscalia [Prosecutor General of Ecuador] to get [TexPet's former attorneys] convicted."  *See* Ex. 56, DONZ00028909 at 2.  In fact, Donziger admitted in his deposition that publicity about the criminal investigation of these two attorneys was one of the

---

[11]  The July 22, 2010 memorandum also explains that "the Borja story" has "immense strategic value for us," but notes that "[t]he only downside to a Borja-based application (other than time/expense) is that Borja/Chevron might be able to show at deposition that some of the veriled [sic] comments in the transcript were just braggadocio for benefit of his friend.  But since we would <u>control</u> the deposition, this could be <u>controlled</u>."  Ex. 53, DONZ00026937 at 3 (emphasis in original).

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

means that the Lago Agrio plaintiffs used to put pressure on Chevron for a larger settlement. *See* Ex. 8, Donziger Depo. at 454:19-455:24.  As Judge Kaplan recently held, the criminal prosecution "appears to have been instigated by Donziger and others working with him for the base purpose of coercing Chevron to settle and undermining a significant element of its defense in Ecuador, the release it obtained from the [ROE]." *Chevron II*, 2010 WL 4910248, at *17; *see also id.* at *8-11.

In an email exchange in August 2005 (which appears to be an excerpt from an ongoing correspondence) among representatives of the Lago Agrio plaintiffs and Ecuador's Attorney General's office, plaintiffs' counsel Alberto Wray wrote, "if at some point we want the Government and the Attorney General to play for our side, we must give them some ability to maneuver."  Ex. 22 (Aug. 2005 email exchange between M. Escobar, A. Wray, C. Bonifaz, and others regarding filing criminal charges against the former TexPet attorneys who signed the settlement and release).  Martha Escobar, a deputy of the Attorney General, responded that both the office and "all of us working on the State's defense were searching for a way to nullify or undermine the value of the remediation contract and the final acta [the 1998 Final Release] . . ." *Id.*

In that same email exchange, Martha Escobar confirmed that the Attorney General was still determined to prosecute "those who executed" the 1995 Settlement Agreement and the 1998 Final Release, despite the absence of evidence of any wrongdoing:  "The Attorney General remains resolved to have the Comptroller's Office conduct another audit (that also seems unlikely to me given the time); he wants to criminally try those who executed the contract (that also seems unlikely to me, since the evidence of criminal liability established by the Comptroller's Office was rejected by the prosecutor . . ."*Id.*  The Attorney General later informed one of the plaintiffs' representatives that "he want[ed] [them] to work together on this matter" and that, at least initially, "he [did] not want [their] meetings to be made public."  Ex. 62, DONZ00028129 (certified translation of Jan. 31, 2006 email between Donziger and J. Prieto regarding "Remediation Agreement Nullification!!").

The Lago Agrio plaintiffs' attorneys were also behind the ROE Attorney General's (also called the Procurador) investigation of Borja. For example, the Attorney General wrote to an attorney connected to Donziger asking for the recordings of the conversations between Escobar and Borja "to facilitate an ongoing investigation." Ex. 57, DONZ00019633. If, as the ROE claimed to this Court, the Prosecutor General has the exclusive power to investigate crimes, then one would have expected him, not the Attorney General, to request the recordings. Additionally, if, as the ROE also claimed to this Court, Borja's testimony is to be used by the ROE in the Treaty Arbitration, then the Attorney General would not have invoked an "ongoing investigation" as the basis for his request; he would have said that he needed the recordings to present at the Treaty Arbitration.

On July 22, 2010, investigator Grant Fine described the "[a]reas of [i]nvestigation" in the Lago Agrio Litigation that he had undertaken for Donziger. Among them: "Coordinate with the [Ecuadorian] Solicitor General's office, Attorney General's office, in order to get all tax and banking records relating to Borja's tax id number. Same for Portilla, Borja's [wife]." Ex. 58, DONZ00036781. In addition, Donziger had in his possession a copy of a broad subpoena ordered and issued by the Prosecutor General on January 20, 2010 that was directed to Borja and his wife, other Ecuadorian and U.S. citizens. Donziger emailed the subpoena to Fine under the subject heading "see attached – important" on February 11, 2010. Ex. 59, DONZ00031014-5; Ex. 60, DONZ00029570; Ex. 61, Jan. 20, 2010 Subpoena (certified translation of ONZ00031015). The evidence suggests that the Attorney General, not the Prosecutor General, gave the subpoena to Donziger because Fine told Donziger that "[the subpoena] is exactly what I told them to get (through the [P]rocu[rador] [the Attorney General])." Ex. 60, DONZ00029570.

Therefore, the ROE misled this Court with repeated assurances of walls of separation between the Attorney General and the Prosecutor General and its claims to need Borja's testimony solely for the Treaty Arbitration. In its offer to join the Attorney General (Procurador) to the ROE's § 1782 application, counsel for the ROE told this Court that the Attorney General's role is "analogous, your Honor, to [the United States] attorney general, with one important caveat. That is, he has jurisdiction only over all civil matters . . . . Nothing dealing with

BOIES,  SCHILLER  &  FLEXNER  LLP

OAKLAND,  CALIFORNIA

criminal." Tr. of Nov. 10, 2010 Hearing at 15-16, *In re Republic of Ecuador*, No. 10-mc-80225 (N.D. Cal.); *see id.* at 42 ("A co-equal, but very different, is what's called the fiscalia, f-i-s-c-a-l-i-a. We do not report to the fiscalia. I frankly don't know where that investigation is at . . . ."). Additionally, when counsel for Borja stated that the Attorney General is conducting the criminal investigation in Ecuador, ROE's counsel interjected "[n]o, it's not." *Id.* at 36:21-37:2. Then, when the Court asked the ROE's counsel, "What about the harassment? What about the Ecuador prosecution?," counsel responded that he needed to "correct [Borja's] counsel," repeated that the Attorney General manages only civil matters and is "very different" from the Prosecutor General, and "represent[ed]" to the Court that the ROE simply wanted discovery for the Treaty Arbitration. *Id.* at 42:4-13.

Contrary to those representations, Donziger's document production shows that he and the Lago Agrio plaintiffs' team (1) convinced the ROE and its Prosecutor General to file false criminal charges (that the ROE previously dismissed for insufficient evidence) against Chevron's employees and investigate Borja; (2) caused the ROE to file its § 1782 application so the Lago Agrio plaintiffs could use that evidence in the Lago Agrio Litigation; and (3) now filed their own § 1782 application to create an appearance of impartiality and distract from evidence that the ROE improperly invoked this Court's jurisdiction. For its part, the ROE - a nation that released TexPet from liability – has helped the Lago Agrio plaintiffs undermine its own release to obviate its and Petroecuador's responsibility to clean up sites that Petroecaudor has been polluting (and not remediating) for two decades. The ROE also concocted false criminal charges against Chevron's employees (and its own citizen), strategized with the Lago Agrio plaintiffs' attorneys over how to destroy Borja's credibility and to vindicate Judge Nunez's rulings on the appointment of Cabrera and acceptance of his reports), and tuned a blind eye to the mounting evidence of corruption in the Lago Agrio Litigation. Now, the Lago Agrio plaintiffs' attorneys and the ROE and its Attorney General have asked this Court to further their efforts to undermine Borja's tape recordings of Judge Nunez.

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

### III.   THE LAGO AGRIO PLAINTIFFS' COUNSEL APPEAR TO LACK AUTHORITY TO REPRESENT THE LAGO AGRIO PLAINTIFFS

None of the U.S. attorneys who claim to represent the Lago Agrio plaintiffs in U.S. courts appear to have actual authority to represent the Lago Agrio plaintiffs, including the attorneys who filed this Application.  Chevron recently presented evidence to Judge Kaplan that (1) the Lago Agrio plaintiffs' attorneys claim to represent at least one man who died in 2008, *compare* Hall Ex. A *with* Ex. 8, Donziger Depo. At 1650:22-1651:23; (2) forensic examiner Gus R. Lesnevich concluded that 20 of the 48 signatures on the document purporting to ratify the 2003 Lago Agrio plaintiffs' complaint and appoint the Lago Agrio plaintiffs' attorneys in Ecuador were forged, Ex. 68; and (3) Donziger admitted that none of the law firms claiming to represent the so-called "Lago Agrio plaintiffs" in the U.S. proceedings has an executed retainer agreement with any of the individual plaintiffs or an agreement with all of them.  Ex. 8, Donziger Depo. at 181:19-23, 190:7-11, 2278:3-11.  Judge Kaplan then issued an order to show cause why the Lago Agrio plaintiffs' attorneys appearing in that § 1782 action "should not be sanctioned for purporting to represent the [Lago Agrio] plaintiffs' when they are not authorized to do so."[12]  Ex. 69, Order at 2, *In re Chevron Corp.*, No. 10-mc-00002 (S.D.N.Y. Jan. 7, 2010).  Attorneys Maples and Wilson appear to be in the same position.

Accordingly, this Court should defer ruling on the Lago Agrio plaintiffs' § 1782 request until Judge Kaplan determines the issue (or the attorneys here present evidence that they actually represent the Lago Agrio plaintiffs).[13]

---

[12] A court "has power, at any stage of the case, to require an attorney, one of its officers, to show his authority to appear."  *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927); *Meredith v. Ionian Trader*, 279 F.2d 471, 473-74 (2d Cir. 1960).  Upon a challenge to an attorney's authority to represent a client, the burden is on that attorney to establish the validity of the representation or face dismissal of the suit or similar penalty.  *See In re Retail Chemists Corp.*, 66 F.2d 605, 608 (2d Cir. 1933); *see also Donnelly v. Parker*, 486 F.2d 402, 405 n.6 (D.C. Cir. 1973).

[13] Judge Kaplan has given the purported counsel for the Lago Agrio Plaintiffs there until January 19, 2011 to respond.

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

IV.     **THE LAGO AGRIO PLAINTIFFS' APPLICATION WAS BROUGHT IN BAD FAITH AND SHOULD BE DENIED IN THIS COURT'S EXERCISE OF ITS DISCRETION**

A.     **Standard**

28 U.S.C. § 1782 authorizes a federal district court, "upon the application of any interested person," to order discovery of a "person [who] resides or is found" in its district "for use in a proceeding in a foreign or international tribunal."  28 U.S.C. § 1782(a).  In addition, four factors guide a district court's consideration of whether to grant a § 1782 application: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) whether the foreign tribunal is receptive to U.S. federal-court assistance; (3) whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions" or is otherwise made in bad faith; and (4) whether the request is "unduly intrusive or burdensome."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004); *see, e.g.*, *In re Republic of Ecuador* ("*Republic of Ecuador I"*), No. 10-mc-80255, 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010) (No. 9).

B.     **The Discretionary Factors Weigh in Favor of Denying The Application.**

"[A] district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so."  *Intel*, 542 U.S. at 264; *Republic of Ecuador I*, 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010) (No. 9).  A court should not grant a § 1782 application when it is sought in bad faith.  *See, e.g.*, *In re Sveaas*, 249 F.R.D. 96, 106 (S.D.N.Y. 2008); *Chevron Corp. v. Shefftz*, --- F. Supp. 2d ---, 2010 WL 4985663, at *4 (D. Mass. Dec. 7, 2010). *In re Chevron Corp.*, 2010 WL 4883111, at *3 (W.D. Va. Nov. 24, 2010) (same).  The Lago Agrio plaintiffs' and the ROE's § 1782 applications were not filed in good faith and so should be denied.

As set forth above, there does not appear to be a legitimate attorney-client relationship between the filers of the Lago Agrio plaintiffs' § 1782 application and the named plaintiffs, and there are substantial mischaracterizations of fact in the Application.  Moreover, although the Lago Agrio plaintiffs' application asserts that the Lago Agrio plaintiff "have an urgent need for

22

the discovery sought" and so request an accelerated briefing schedule (Pls' App. at 4 and Pls' Br. at 18), plaintiffs' counsel recently argued the exact opposite when it suited their purpose, claiming to other federal courts that a judgment on the merits in the Lago Agrio Litigation is not imminent. *See e.g.*, Pls' Br. at 3, *In re Chevron Corp.*, No. 10-4699 (3rd Cir. filed Dec. 22, 2010) (arguing there is no urgency for § 1782 discovery because a judgment by the Lago Agrio court "**is not expected *for months***" notwithstanding the close of discovery in the Lago Agrio Litigation) (emphasis in original); *In re Chevron Corp.*, 2010 WL 4861351, at *3 (S.D.N.Y. Nov. 30, 2010).  Additionally, their "repeated[] . . . refus[al] to cooperate in seeking a stay of the [Lago Agrio Litigation] to allow more deliberate handling of the" § 1782 actions filed in the United States, led Judge Kaplan to find the Lago Agrio plaintiffs' actions "extremely suspicious" and "inequitable," *Id.* at 3-4.

Beyond the misrepresentations identified above, the Lago Agrio plaintiffs' § 1782 application contains representations for which there is no evidentiary basis and cannot have been made in good faith.  For instance, they falsely accuse Chevron of "attempt[ing] to subvert the judicial process in the Ecuadorian Court."  Pls. Br. at 3, *In re Yaiguaje*, No. 10-mc-80324 (N.D. Cal. filed Dec. 30, 2010) (No. 2).

Accordingly, the Lago Agrio plaintiffs' baseless and false accusations, and their lack of candor with this Court demonstrate the kinds of bad faith that justify denial of their Application.

**V.   ANY GRANT OF RELIEF TO THE LAGO PLAINTIFFS SHOULD BE CONDITIONED ON THEIR AND THE ROE ATTORNEY GENERAL'S PRODUCTION OF INFORMATION RELEVANT TO THE NÚÑEZ BRIBERY SCHEME AND ON CHEVRON'S ABILITY QUESTION THE WITNESSES**

In the event the Lago Agrio plaintiffs' § 1782 application is ultimately granted or Borja's motion for reconsideration denied and the ROE's subpoena enforced, Chevron requests that this Court's orders authorizing discovery be conditioned on discovery by Chevron of evidence related to Borja's meetings in Ecuador and Escobar's recordings, as well as Chevron's ability to question the witnesses.

A district court retains wide discretion "to impose conditions on [§ 1782] discovery that it

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

1   deems appropriate." *Chevron Corp.*, 2010 WL 5173279, at *4; *In re Esses*, 101 F.3d 873, 876

2   (2d Cir. 1996) ("Section 1782 grants district courts wide discretion to determine whether to grant

3   discovery and equally wide discretion to tailor such discovery to avoid attendant problems.").

4   "The flexibility of § 1782(a) allows a court to be creative in fashioning relevant discovery

5   mandates," *Minatec Finance S.A.R.L. v. SI Group, Inc.*, 2008 WL 3884373, at *9 (N.D.N.Y.

6   2008), in order to "maintain[] parity among adversaries in litigation," *Intel*, 542 U.S. at 262.  For

7   instance, "[w]hen information is sought by an 'interested person,' a court c[an] condition relief

8   upon that person's reciprocal exchange of information," *id.*, including requiring the applicant to

9   "mak[e] witnesses and documents available in the United States."  *In re Malev Hungarian*

10  *Airlines*, 964 F.2d 97, 101-02 & n.4 (2d Cir. 1992); *see Euromepa S.A. v. R. Esmerian, Inc.*, 51

11  F.3d 1095, 1102 (2d Cir. 1995).

12          Chevron, as a party to both the Lago Agrio Litigation and the Treaty Arbitration, is an

13  interested person in these proceedings for purposes of obtaining discovery pursuant to § 1782.

14  Additionally, although Borja may be a relevant witness to the bribery solicitation scheme, he is

15  not the only witness nor is he the only person with relevant information.  In fact, Borja's

16  understanding of the bribery scheme is likely limited to his interactions with Judge Nunez and

17  the other individuals discussed above.  The other individuals involved in the bribery scheme and

18  its cover-up are as, if not more, likely to have relevant information.  Chevron therefore requests

19  that the conditional discovery sought in the application filed concurrently with this opposition be

20  granted.

21

22

23

24

25

26

27

28

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION

**CONCLUSION**

Chevron requests that the Lago Agrio plaintiffs' § 1782 application be denied, or stayed pending Judge Kaplan's determination of representation.  If the Application is granted, then Chevron requests that the discovery sought be conditioned on a grant of reciprocal discovery.

Dated:  January 14, 2011                              Respectfully submitted,
                                                      BOIES, SCHILLER & FLEXNER LLP


                                                      By: /s/ David W. Shapiro
                                                          David W. Shapiro
                                                          Attorneys for
                                                          CHEVRON CORPORATION

CHEVRON'S RESPONSE TO LAGO AGRIO PLAINTIFFS' § 1782 APPLICATION